## Stetler v. CDL Medical Technologies Inc.

*Bruce L. Baldwin,* for plaintiff.
*Fred B. Buck,* for defendants.

LASH, *J.,* May 27, 2003—Plaintiff, Desiree S. Stetler, individually and as administratrix of the estate of David B. Stetler, deceased, has appealed the order of this court entered April 25, 2003, denying plaintiff's motion for post-trial relief following the court's entry of a molded verdict on April 16, 2003.

Plaintiff maintains this wrongful death and survival action as a result of the death of her husband, David B. Stetler (decedent), resulting from an accident, when the decedent, operating his motorcycle, collided with a tractor-trailer owned by defendant, CDL Medical Technologies Inc., and operated by defendant, Thomas McGinnis. The accident occurred in the southbound lane of North Fifth Street, Muhlenberg Township, Berks County, on October 16, 2000 at approximately 12:07 a.m.

Trial was held on April 14, 15, and 16 of 2003. The jury returned a verdict in favor of both defendants and against the plaintiff on both actions. Plaintiff then filed her motion for post-trial relief, which was denied without argument on April 25, 2003.

In her concise statement of matters complained of on appeal, plaintiff sets forth the following:

(1) The only evidence of intoxication presented at hearing on motions in limine was a toxicology report indicating a blood alcohol reading of 0.151 percent, based on a single sample of blood drawn from plaintiff's decedent's heart post-mortem.

(2) The factual circumstances of the motor vehicle collision itself did not provide any significant corroborative evidence of intoxication.

(3) At hearing in limine, defendants presented no independent corroborating evidence to show that plaintiff's decedent had been intoxicated.

(4) At hearing in limine, plaintiff presented affirmative evidence of plaintiff's decedent's sober behaviors during the half hour prior to the fatal collision.

(5) Expert toxicological testimony presented at hearing in limine established that it was impossible to determine the reliability of the blood alcohol reading of 0.151 percent given the uncontradicted evidence that plaintiff's decedent died from major chest trauma and internal injuries, and given the further uncontradicted evidence that the blood test was conducted with a single specimen of blood drawn from or near the decedent's heart, without the benefit of corroborating blood tests or autopsy.

(6) Defendant's expert testimony interpreting the significance of the blood alcohol reading was not in any way corroborative of the accuracy of the blood alcohol test itself.

(7) This honorable court erred in permitting the introduction of blood alcohol evidence without independent corroborating evidence of intoxication, particularly in light of plaintiff's presentation of affirmative evidence of the decedent's sober behavior during the half hour before the fatal motor vehicle collision.

(8) The evidence of blood alcohol content was at once unreliable and unfairly prejudicial to plaintiff, leading the jury to disregard overwhelming evidence of negligence on the part of defendants.

(9) Plaintiff raised the issue of admissibility of blood alcohol content evidence in pretrial proceedings by way of motion in limine filed on February 7, 2003, which

motion was denied by this honorable court on March 10, 2003, and also by way of a motion for post-trial relief, which motion was denied by this honorable court on April 25, 2003.

Prior to trial, plaintiff had filed a motion in limine to preclude evidence of alleged intoxication. The motion anticipated defendants' intent to produce evidence of the results of a test on decedent's blood alcohol content. The test result was 0.151 percent. This court heard argument on the motion on February 18, 2003.

While proof of intoxication is relevant where reckless or careless driving of an automobile is the matter at issue, the mere fact of drinking intoxicating liquor is not admissible, being unfairly prejudicial, unless it reasonably establishes a degree of intoxication which proves unfitness to drive. *Fisher v. Dye,* 386 Pa. 141, 148, 125 A.2d 472, 476 (1956).

Plaintiff's first claim is that defendant could not show that decedent was intoxicated to such a degree that he was unfit to drive because the only evidence available was the blood alcohol reading of 0.151 percent, and even if accurate, this evidence was inadmissible without independent corroboration.

Initially, we note that we accepted plaintiff's argument that, independent of the blood alcohol content, there was no evidence that decedent was intoxicated. The accident occurred as defendant McGinnis was in the process of positioning his tractor-trailer to deliver an MRI unit to an urgent care facility on the North Fifth Street Highway. At the time of impact, the tractor-trailer was either slowly moving or stopped while blocking both northbound lanes, the middle turn lane, the left-hand south-

bound lane, and a portion of the right-hand southbound lane. Defendant McGinnis testified he did not see the motorcycle and was not aware of its existence until he heard the impact. There were no eyewitnesses.

There were no pre-impact skid marks left by the motorcycle. No one was able to produce any evidence establishing that decedent was drinking or at a bar prior to the accident. There was no evidence of erratic driving nor any physical characteristics of decedent suggesting he was under the influence. Thus, there was no evidence of impairment, loss of visual or auditory perception, loss of alertness, or diminution in judgment, except the circumstances of the accident itself.

In support of her position, plaintiff relies on the case of *Billow v. Farmers Trust Company,* 438 Pa. 514, 266 A.2d 92 (1970), for the proposition that a blood alcohol content of .10 percent or more, when standing alone, is insufficient to show degree of intoxication which proves unfitness to drive and therefore is inadmissible. She also cites the case of *Ackerman v. Delcomico,* 336 Pa. Super. 569, 576, 486 A.2d 410, 414 (1984), which states:

"The theory behind allowing a blood alcohol level to be admitted into evidence in a civil case is that it is relevant circumstantial evidence relating to intoxication. However, blood alcohol content alone may not be admitted for the purpose of proving intoxication. There must be other evidence showing the actor's conduct which suggest intoxication. Only then, and if other safeguards are present, may a blood alcohol level be admitted."

The language in *Ackerman* appears to be dispositive in favor of plaintiff.

Further analysis is needed, however. First, plaintiff cannot rely on the *Billow* decision because the holding entered in that case was based on a different set of facts. In *Billow,* evidence of a blood alcohol content of .14 percent was excluded because there was no evidence presented to show that a blood alcohol content of that level established unfitness to drive. The moving party's expert offered an opinion that the BAC of .14 percent would render the person "affected" in his driving, falling short of the requirement of establishing "a degree of intoxication which proves unfitness to drive." Thus, the *Billow* court's holding was limited to its determination that the expert's testimony was insufficient. It did not speak to the question of whether independent corroborative evidence, beyond a sufficient expert opinion, is necessary to permit a blood alcohol reading to be admitted.

Secondly, holdings in several other cases state that expert testimony regarding the BAC level may independently establish proof of intoxication. In addressing the need for additional evidence beyond the mere reading of the BAC, the court in *Locke v. Claypool,*[1] 426 Pa. Super. 528, 535-36, 627 A.2d 801, 805 (1993), stated:

"In *Gallagher v. Ing,* [367 Pa. Super. 346, 532 A.2d 1179 (1987), *alloc. denied,* 519 Pa. 665, 548 A.2d 255 (1988)], this court stated:

" 'the "other" evidence necessary to render admissible a blood alcohol content *in excess of .10 percent,* it has

---

1. In *Locke,* the blood alcohol content was inadmissible because it was below .10 percent (.06 percent) and was below any presumptive intoxication level. Under these circumstances, expert testimony, without any objective indicia that *Locke* was unfit to operate his bike was entirely speculative and highly prejudicial. (426 Pa. Super. at 535-36, 627 A.2d at 805).

been held, may consist of expert testimony interpreting the significance of the results of blood alcohol tests with respect to unfitness to drive.' 367 Pa. Super. at 353, 532 A.2d at 1183 . . . . The rationale behind this rule is that when a person's blood alcohol content exceeds .10 percent, our legislature has determined that he is presumptively unfit to drive. 75 [536] Pa.C.S. §1547(d)(3). The 'presumption' of unfitness to drive, however, is inapplicable to civil cases, and a jury may not be instructed regarding the presumption. *Suskey v. Loyal Order of Loyal Moose Lodge No. 86,* 325 Pa. Super. 94, 472 A.2d 663 (1984). Therefore, expert testimony is helpful to explain the significance of a blood alcohol content [of] .10 percent, without reference to the 'presumption.' *Ackerman v. Delmonico [sic], supra,* 336 Pa. Super. at 576, 486 A.2d at 414."

Note also the case of *Beneshunas v. Independence Life and Accident Insurance Company,* 354 Pa. Super. 391, 397 n.1 512 A.2d 6, 9 n.1 (1986), where in the footnote, the court states: "we disagree with the trial court's suggestion that appellant presented *no* evidence that McGurl's intoxication, if such was the fact, had contributed causally to the accident. McGurl's blood alcohol content, as shown by blood and urine tests, was sufficient to create an inference that McGurl was unfit to drive a motor vehicle." (emphasis in original)

This court followed those cases which state a blood alcohol content may be admitted into evidence to establish intoxication if: (1) the blood alcohol content is over .10 percent, and (2) there is corroborative expert testimony sufficient to establish that the person's blood alcohol content rendered him incapable of safe driving.

Accordingly, on February 19, 2003, after argument held, this court entered an order, ruling as follows:

"(1) The decedent's blood alcohol content of .151 is not admissible without introduction of corroborative evidence of intoxication.

"(2) The factual circumstances of the accident itself are insufficient to provide sufficient corroborative evidence necessary to have the blood alcohol content introduced.

"(3) when blood alcohol content is in excess of .10 percent, expert testimony interpreting the significance of the blood alcohol test in the context of whether the decedent was intoxicated and unfit to drive may be sufficient corroborative evidence to permit the blood alcohol content to be admitted.

"(4) To determine whether the testimony of defendants' expert would provide sufficient corroboration, an in camera hearing is scheduled for March 4, 2003, to commence after jury selection. Defendants shall be prepared to produce sufficient evidence to establish:

"(a) the accuracy of the blood alcohol content; and

"(b) intoxication of the decedent."

The in camera hearing was held on March 4, 2003. Both sides presented expert testimony, defendants presenting Dr. Richard Saferstein, a forensic toxicologist, and plaintiff presenting Dr. Gary Lage, an expert in forensic toxicology and pharmacology. The experts were in conflict on the issue of the accuracy of the blood alcohol content. However, both experts agreed that if the blood alcohol content of .151 percent was accurate, then decedent was intoxicated to a degree that he was unfit to drive.

Plaintiff's argument focused on the method of obtaining the blood sample. The blood sample was obtained by a deputy coroner who inserted a needle into decedent's heart chamber and extracted the sample. Plaintiff urges that the test may have been corrupted by fluid from the pericardial sac or from absorption from the stomach. Plaintiff points to the Reading Hospital records which suggest the decedent suffered a probable "flailed chest," suggestive of significant chest trauma.[2]

Plaintiff also argues that if the blood was drawn from the right auricle of the heart, the tests may have been significantly elevated if the alcohol in decedent's system was still being absorbed at the time of his death. In other words, if the deputy coroner extracted the blood from the right auricle as opposed to the left ventricle, this may result in an elevated reading. Plaintiff concludes that a blood sample should also have been drawn from decedent's femoral vein, and without this additional sample, the sample taken cannot be relied upon as accurate.

Contrary to plaintiff's assertions, the evidence presented at the hearing were sufficient to establish the accuracy of the blood alcohol test. Defendant called Lloyd Howard, a toxicological chemist employed by the Pennsylvania Department of Health, Bureau of Laboratories, who was the individual who analyzed the blood sample. Mr. Howard noted that since an amendment to the Motor Vehicle Code in 1968, coroners and medical examiners in Pennsylvania take blood and/or urine specimens from all drivers 15 years of age and older who die as a

---

2. The death certificate listed the immediate cause of death as being multiple trauma and internal injuries.

result of motor vehicle accidents. (N.T. March 4, 2003, p. 27.) Mr. Howard referenced 75 Pa.C.S. §3749(b) and title 28 of the Pennsylvania Code, sections 29.21 and 29.22. Section 29.21 of the code states the following:

"Section 29.21. Collection of blood specimens.

"(a) The coroner, deputy coroner, medical examiner, deputy medical examiner or his authorized agent shall collect or cause to be collected a specimen of blood from the body of an operator of a motor vehicle, or the body of a pedestrian over 16 years of age, who dies within 4 hours following a motor vehicle accident.

"(b) Specimens shall be collected in the following manner and subject to the following conditions:

"(1) Blood specimens shall be collected with equipment prescribed by the Department of Health.

"(2) At least 10 milliliters of blood shall be taken from the heart, whenever possible. Otherwise, 10 milliliters of blood shall be taken from the femoral vein or other larger blood vessel. Specimens shall be taken as soon as possible after death, and before the body is embalmed.

"(3) Blood specimens may not be taken with embalming equipment. Alcohol or alcoholic antiseptics may not be used in a manner which may contaminate the specimen."

Clearly, the method employed by the deputy coroner, extraction from the heart, is authorized, and is in fact the method of choice "whenever possible." In obtaining the blood sample from the heart, the deputy coroner did not run into any complications stating: "No, I remember distinctly it was a very easy case knowing the nature of the injuries." (N.T. March 4, 2003, p. 13.) The sample did not appear to be contaminated. (N.T. March 4, 2003, p.

16.) Further, there was nothing regarding chest injuries which would have led him to believe that drawing a sample from the heart would be inappropriate. (N.T. March 4, 2003, p. 16.)

In enacting section 3749 of the Motor Vehicle Code and section 29.21 of the Pennsylvania Code, the legislature deemed that taking a blood sample from the heart is a reliable method. Accordingly, the fact that there was no sample taken from the femoral vein was not, per se, objectionable.

Defendant then called Dr. Saferstein, who opined that the blood alcohol test was "reliable and scientifically reliable, an appropriate indicator of the decedent's true blood alcohol concentration." (N.T. March 4, 2003, p. 47.) First, Dr. Saferstein rules out absorption as a factor. He notes that up to within 30 minutes of the accident there was no evidence that the decedent had taken any alcohol. As such, it is likely that the alcohol had been absorbed into the blood stream prior to decedent's death. (N.T. March 4, 2003, p. 48.) He notes: "Even if there was a possibility of passage of alcohol through a laceration of the stomach and into the bloodstream and into the heart, which I doubt, that even if that was possible in this case, there is no evidence that there was a significant amount of alcohol in the decedent's stomach for that to have contributed any significant way to the blood alcohol level."[3] (N.T. March 4, 2003, p. 48.) In fact, concentrations of alcohol in the stomach are usually surpris-

---

3. In fact, most alcohol consumed goes into the small intestine, as much as 80 percent, and is absorbed from there. Thus, total absorption of alcohol from the stomach may occur much more quickly than 60 minutes. (N.T. March 4, 2003, pp. 68-69.)

ingly low even when large amounts of alcohol have been consumed immediately prior to death. (N.T. March 4, 2003, p. 51.)

Secondly, Dr. Saferstein notes that there does not appear to be any significant evidence of major chest trauma.[4] Finally, he relies on recognized treatises for his opinions and for the proposition that there is little possibility of contamination of the heart muscle through diffusion from the stomach. (N.T. March 4, 2003, p. 49.)

Boiled down, plaintiff's entire argument is founded on the possibility of chest trauma affecting the blood alcohol content in the heart. However, for this to be a problem, there would have had to have been alcohol entering into the heart muscle from some other part of the body. If the alcohol had already been absorbed into the bloodstream, which would have occurred shortly after consumption, contamination could not have occurred. It is very unlikely that absorption was not complete in this case. While no one knows when the decedent consumed alcohol, plaintiff's own evidence shows that it was not immediately prior to the accident, as the decedent was present at an adult bookstore for several minutes prior to traveling down Fifth Street to his death. Further, even if there was some alcohol left in the stomach, and the integrity of the stomach would have been compromised, permitting a release of the alcohol into the body, it is still unlikely, based on the studies, that the alcohol would have been absorbed into the heart muscle. Finally, the deputy coroner's recollection does not support the existence of significant chest trauma.

---

4. No autopsy was performed.

Plaintiff's other related arguments that the sample could have been taken from the arterial portion of the heart rather than the venial, also requires that absorption was not complete and also attacks the method itself, which, as stated, is deemed reliable by Pennsylvania's Legislature. Plaintiff's argument that the sample could have improperly been taken from the pericardial sac, which is more susceptible to contamination by absorption, is also met by the testimony, particularly the deputy coroner, who testified that he can tell the difference in appearance between pericardial fluid and blood, and that he drew blood in this case.

Defendants' evidence was sufficient to establish that the blood alcohol test taken in this case was reliable. The theories raised by plaintiff and her expert, Dr. Lage, then go to the weight of the evidence, an issue to be decided by the jury. For the aforesaid reasons, this court ruled that the admission of the blood alcohol reading of .151 percent, with corroborative evidence supplied by Dr. Saferstein, the deputy coroner, and the toxicologist, was proper.

Nevertheless, if this ruling is determined to be in error, it should be deemed harmless. The question of decedent's intoxication goes to the issue of whether the plaintiff's decedent was contributorily negligent. Before the jury was to consider that issue, it had to first consider whether defendants were negligent.

The court provided a verdict slip containing interrogatories setting forth that the first determination the jury was to make was regarding the negligence of defendants. The jury returned a verdict setting forth its finding that the defendants were not negligent. Thus, the jury never

reached the issue of plaintiff's contributory negligence, and never had to consider whether the decedent was intoxicated or whether the blood alcohol reading was reliable.

Further, plaintiff's suggestion in paragraph 8 of her "concise statement of matters complained of" that the jury disregarded "overwhelming evidence of negligence on the part of defendants" is without merit. The police officer investigating the accident concluded that the driver, defendant McGinnis, did not commit any motor vehicle violations. At the time of the accident, defendant McGinnis had his four-way flashes activated. His headlights were on, the side running lights along the length of the trailer were on, and the cap apron lights on top of the trailer were on. There was reflective tape along the length of the trailer, all of which rendered the tractor-trailer highly visible. The maneuver performed by defendant McGinnis was done during a period of low traffic (just after midnight), and was implemented to enable the tractor-trailer to back into the urgent care parking area in the shortest amount of time, and with the least difficulty. The maneuver was not started until defendant McGinnis observed that there was no traffic. The maneuver was performed with the contemplation that the portion of the highway involved was well lit by streetlights and commercial establishments. The sight distance heading southbound, the direction the decedent was traveling, was approximately 1/2 mile. There was no reason that the decedent would not have seen the tractor-trailer well before impact. If anything, the accident was caused by the decedent failing to stop within the assured clear distance ahead, not by any negligence on the part of defendants.

Wherefore, it is respectfully requested that your honorable court affirm this court and dismiss plaintiff's appeal.