Nancy BRAUN, Guardian of the Person and Estate of John Braun, an Incapacitated Person, and Nancy Braun in her Own Right, Appellant

v.

TARGET CORPORATION and Thomas Lindstrom & Co., Inc. and Jeffrey M. Brown & Associates, Appellees.

Superior Court of Pennsylvania.

Argued Jan. 8, 2008.

Filed Oct. 23, 2009.

Edward J. Carreiro, Jr., Philadelphia, for appellant.

Carl D. Buchholz, III, Philadelphia, for Target, appellee.

Lisa B. Apelian, Philadelphia, for Brown & Assoc., appellees.

BEFORE: KLEIN, GANTMAN, and KELLY, JJ.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, Nancy Braun, as guardian of the person and estate of her husband John Braun (Mr. Braun), and in her own right, appeals from the judgments entered in the Philadelphia Court of Common Pleas following the denial of her post-trial motions for removal of the compulsory nonsuit entered in favor of Appellee, Jeffery M. Brown & Associates (JMB), for judgment notwithstanding the verdict (JNOV) in favor of Appellee, Target Corporation (Target) and/or a new trial against both Target and JMB. We affirm.

¶ 2 The relevant facts and procedural history of this case are as follows. On September 27, 2002, Target and JMB entered into a Project Agreement for the construction of a new Target store at 11000 Roosevelt Boulevard in Philadelphia. The contract included certain terms of the Master Agreement (concerning the construction of various Target stores in addition to this location), the Project Award, General Conditions of the Contract for Construction, Drawings and Specifications, and other *addenda*. The contract expressly provided Occupational Safety and Health Administration (OSHA) regulations applied to this construction site. Pursuant to the contract, JMB subcontracted various work projects for the Target construction. On September 30, 2002, JMB subcontracted with Lindstrom & Co. (Lindstrom) to perform the steel erection portion of construction. Lindstrom employed Mr. Braun as a connector of steel roofing joists and joist girders on the project.

¶ 3 On November 29, 2002, Lindstrom began its steel work at 7:00 a.m. Mr. Braun and his partner, David Truede, were responsible for connecting the steel joists. Mr. Braun worked on the railed platform of a scissor lift most of the morning at a height of about eighteen (18) feet.

¶ 4 At approximately 12:00 p.m., Mr. Braun, Mr. Truede, and others went to Wade's Irish Pub for their lunch break. Mr. Braun drank beer during their break, although the amount he consumed is uncertain. The men returned to the construction site twenty-five (25) minutes later.

¶ 5 After the lunch break, Mr. Braun returned to the same platform of the scissor lift that he had worked on all morning. In addition to the guardrails surrounding

the lift, Mr. Braun had other fall protection equipment (a harness and a lanyard) accessible to him on the platform. Each scissor lift contained an anchorage to which the connector could secure himself, or tie off. Mr. Braun, however, did not tie off that afternoon following return from his lunch break. Mr. Braun's work did not require him to leave the railed platform for any reason. Nevertheless, the crane operator watched Mr. Braun inexplicably exit the scissor lift platform unsecured, step out onto an eight (8) inch wide steel beam, mis-step and fall to the ground.

¶ 6 At approximately 1:44 p.m., an ambulance transported Mr. Braun to the Frankford Hospital Emergency Room as a trauma-alert patient. Among other specifications, trauma-alert protocol specifically required testing each patient's blood for the presence of alcohol. Within forty-five minutes of the accident, hospital personnel drew Mr. Braun's blood, gave him a patient number, and initially registered him as John Doe. Upon learning Mr. Braun's identification, his medical reports carried his correct name but also retained his original patient number. Mr. Braun's blood test results revealed an ethyl-serum level of 321 milligrams per deciliter of blood (0.321), or a blood alcohol concentration (BAC) level of 270 milligrams per deciliter of blood (0.27).

¶ 7 Following the accident, Mr. Braun filed a claim against Lindstrom, pursuant to the Pennsylvania Workers' Compensation Act. A Workers' Compensation referee presided over the hearing and subse-

quently denied Mr. Braun benefits on February 21, 2003.[1] Specifically, the referee denied Mr. Braun's benefits for other good cause, that being Employer's investigation shows [Mr. Braun] was under the influence of an excessive amount of alcohol at the time of the injury, and therefore, the claim is being denied under Sections 201(c) and 301(a) of the Pennsylvania Workers' Compensation Act. (Petition to Review Compensation Benefits, 5/26/04, at 2; Supp.R.R. at 158c). Mr. Braun appealed the decision.[2]

¶ 8 Meanwhile, on May 20, 2004, Appellant filed a negligence complaint against Lindstrom[3], Target, JMB, and other defendants.[4] On February 2, 2006, JMB filed a pretrial motion in limine to preclude any evidence/testimony at trial concerning safety standards on the worksite, other than OSHA regulations. On February 6, 2006, Appellant filed various motions in limine, including a motion to preclude evidence/testimony at trial regarding Mr. Braun's alcohol consumption, intoxication, and BAC level. The court held a hearing on the motions on February 16, 2006, and subsequently denied each party the requested relief.

¶ 9 Trial commenced on February 21, 2006, and Appellant rested her case on March 2, 2006. That same day, the court granted a compulsory nonsuit in favor of JMB, based on the statutory employer defense, but denied Target's motion for a compulsory nonsuit, and required Target to present its defense. On March 3, 2006, the court charged the jury. The jury re-

---

1. The Notice of Workers' Compensation Denial was issued on February 21, 2003, and indicated that compensation would be stopped as of February 20, 2003.

2. The briefs of the parties dispute the final outcome of the Workers' Compensation proceedings. Nothing in the record confirms that outcome either way.

3. The court granted summary judgment in favor of Lindstrom on November 18, 2005.

4. The court dismissed the other defendants from the case prior to trial, pursuant to stipulation by the parties.

turned a verdict in favor of Target on March 6, 2006, specifically finding that Target was not negligent.

¶ 10 On March 13, 2006, Appellant filed a motion for post-trial relief seeking removal of the nonsuit in favor of JMB, JNOV, and/or a new trial. The court denied Appellant's requested relief on July 10, 2006. On July 26, 2006, the court entered judgment on the verdict in favor of Target. The court entered final judgment in favor of JMB on July 28, 2006. On August 4, 2006, Appellant timely filed her notice of appeal as well as a voluntary statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b).

¶ 11 Appellant raises five issues for our review:

WHETHER THE TRIAL COURT COMMITTED AN ERROR OF LAW DENYING [APPELLANT'S] MOTION *IN LIMINE* TO EXCLUDE EVIDENCE AT TRIAL REGARDING ALLEGED ALCOHOL CONSUMPTION, INTOXICATION, AND BLOOD ALCOHOL CONTENT RELATING TO [PLAINTIFF] IN THE ABSENCE OF ANY EVIDENCE THAT PLAINTIFF WAS IMPAIRED.

WHETHER THE TRIAL [COURT] COMMITTED AN ERROR OF LAW ADMITTING INTO EVIDENCE TESTIMONY RELATING TO ALCOHOL CONSUMPTION, INTOXICATION AND BLOOD ALCOHOL CONCENTRATION IN THE ABSENCE OF ANY EVIDENCE THAT [PLAINTIFF] WAS IMPAIRED.

WHETHER THE TRIAL COURT COMMITTED AN ERROR OF LAW IN GRANTING A COMPULSORY NONSUIT AGAINST [APPELLANT] ON THE BASIS OF THE STATUTORY EMPLOYER DEFENSE, 77 PA. C.S.A. § 52, ASSERTED BY [DEFEN-DANT] WHERE [APPELLANT] HAD ALREADY MADE OUT A *PRIMA FACIE* CASE AGAINST DEFENDANT.

WHETHER THE TRIAL COURT COMMITTED AN ERROR OF LAW WHEN IT PRECLUDED [APPELLANT] FROM PRESENTING EVIDENCE OF STANDARDS FOR SAFETY IN THE CONSTRUCTION INDUSTRY, EVIDENCE OF STANDARDS FOR FALL PROTECTION FOR IRONWORKERS IN THE CONSTRUCTION INDUSTRY, AND EVIDENCE OF THE PRINCIPLES AND PRACTICE OF THE CONSTRUCTION INDUSTRY.

WHETHER THE TRIAL COURT [COMMITTED] AN ERROR OF LAW [DENYING APPELLANT'S] POST TRIAL MOTION FOR [JNOV]. THE EVIDENCE UNEQUIVOCALLY ESTABLISHED [APPELLEES] WERE IN VIOLATION OF THE OSHA REGULATIONS CONTROLLING FALL PROTECTION FOR [PLAINTIFF].

(Appellant's Brief at 9–10).

¶ 12 For purposes of disposition, we consider Appellant's first and second issues together. Appellant argues eyewitness testimony established Mr. Braun was not impaired before his fall. Appellant asserts Mr. Braun's job required him to use advanced motor skills, which he utilized without signs of impairment for thirty (30) minutes prior to his fall. Appellant maintains the mere fact that Mr. Braun consumed beers at lunch is inadmissible, absent corroborating evidence that he was impaired.

¶ 13 Appellant also challenges the chain of custody of the blood specimen used for Mr. Braun's BAC report, because the hospital generated the pathology report one

month after the alleged BAC test.[5] Appellant avers the report is not reliable, as the circumstances surrounding the BAC test are suspect, where Mr. Braun was initially admitted as a John Doe patient but the final pathology report denotes his real name.[6] In sum, Appellant submits the admission of any evidence relating to Mr. Braun's alleged intoxication unduly prejudiced the jury. Appellant concludes the trial court's denial of her motion *in limine* to preclude this evidence constituted reversible error, and this Court must grant Appellant a new trial.

¶ 14 In response, Target and JMB argue the court properly admitted evidence of Mr. Braun's alcohol consumption because the evidence is relevant and probative as to causation and comparative negligence. Target and JMB assert evidence of alcohol consumption is admissible where it competently establishes a degree of intoxication rendering the person unfit to perform the task at hand. Target and JMB maintain Mr. Braun's alcohol consumption, failure to tie off, unexplained and unnecessary exit from the railed platform, high BAC level, and Dr. Pape's expert testimony established that Mr. Braun was unfit to perform the task of operating steel equipment at eighteen (18) feet above ground. Target and JMB explain the court also admitted the evidence of Mr. Braun's alcohol consumption in response to Appellant's admission that Mr. Braun had consumed alcohol throughout the day before his fall but that he was only a casual drinker.

¶ 15 Target and JMB further argue Mr. Braun's hospital report was competent evidence. Target and JMB claim the hospital drew and tested Mr. Braun's blood for the presence of alcohol pursuant to the specific protocol for trauma-alert patients. Target and JMB declare the evidence showed Mr. Braun's blood specimen was taken in the usual course directly from the Emergency Room to an in-house state-licensed laboratory for testing shortly after the blood was drawn. Target and JMB emphasize Appellant failed to impugn the reliability of the blood test or chain of custody involving Mr. Braun's blood specimen. We agree with Appellees' contentions.

¶ 16 The standard by which we review the denial of a post-trial motion for JNOV and/or a new trial is well established:

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict.... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact.... A JNOV should be entered only in a clear case.
>
> Our review of the trial courts denial of a new trial is limited to determining whether the trial court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. In making this determination, we must consider whether,

---

5. Our review of the certified record reveals the pathology report is dated November 29, 2002; the final report was printed out on December 28th. (Pathology Report, 11/29/02, at 1; R.R. at 371a).

6. Appellant does not dispute the results of the BAC test but only the chain of custody of the blood sample.

viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. Consequently, if there is any support in the record for the trial courts decision to deny a new trial, that decision must be affirmed.

*J.W.S. Delavau, Inc. v. Eastern America Transport Warehousing, Inc.,* 810 A.2d 672, 679–80 (Pa.Super.2002), *appeal denied,* 573 Pa. 704, 827 A.2d 430 (2003). An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused. *Sutherland v. Monongahela Valley Hosp.,* 856 A.2d 55, 59 (Pa.Super.2004) (quoting *Paden v. Baker Concrete Const., Inc.,* 540 Pa. 409, 412, 658 A.2d 341, 343 (1995)). A new trial is granted only where the verdict is so contrary to the evidence as to shock one's sense of justice, not where the evidence is conflicting or where the court might have reached a different conclusion on the same facts. *Lombardo v. DeLeon,* 828 A.2d 372, 374 (Pa.Super.2003), *appeal denied,* 579 Pa. 704, 857 A.2d 679 (2004).

¶ 17 Questions regarding the admission or exclusion of evidence are subject to an abuse of discretion standard of review. *Whyte v. Robinson,* 421 Pa.Super. 33, 617 A.2d 380, 383 (1992).

Pennsylvania trial judges enjoy broad discretion regarding the admissibility of potentially misleading and confusing evidence. Relevance is a threshold consideration in determining the admissibility of evidence. A trial court may, however, properly exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Generally[,] for the purposes of this evidentiary rule, prejudice means an undue tendency to suggest a decision on an improper basis. The erroneous *admission* of harmful or prejudicial evidence constitutes reversible error.

*Id.* (internal citations omitted).

¶ 18 Our Supreme Court initially examined the admissibility of evidence of intoxication to prove negligence in *Fisher v. Dye,* 386 Pa. 141, 125 A.2d 472 (1956) as follows: [W]hile proof of intoxication is relevant where reckless or careless driving of an automobile is the matter at issue, the mere fact of drinking intoxicating liquor is not admissible, being unfairly prejudicial, unless it reasonably establishes a degree of intoxication which proves unfitness to drive. *Id.* at 148, 125 A.2d at 476 (emphasis added). *See also Locke v. Claypool,* 426 Pa.Super. 528, 627 A.2d 801 (1993) (applying unfitness standard to evidence of bicyclist's intoxication); *Ackerman v. Delcomico,* 336 Pa.Super. 569, 486 A.2d 410 (1984) (applying unfitness standard to evidence of pedestrian's intoxication).

¶ 19 Corroborative evidence to establish intoxication can be in the form of expert testimony, indicating that the level of drugs or intoxicants in the injured party's bloodstream would have affected his judgment, coordination, and/or impaired his motor skills to such a degree that he was unfit to perform the activity in question. *Gallagher v. Ing,* 367 Pa.Super. 346, 532 A.2d 1179, 1182–83 (1987), *appeal denied,* 519 Pa. 665, 548 A.2d 255 (1988). Corroborative evidence can also be in the form of lay testimony as to the injured party's conduct just prior to or immediately after the incident, for example, whether he exhibited classic signs of intoxication such as slurred speech or a staggered gait. *Id.* at 1183.

¶ 20 Although there is no precise type or amount of evidence necessary to establish the requisite degree of intoxication, this Court has found the following intoxication

evidence admissible as unfitness to perform the task at hand: *Kraus v. Taylor*, 710 A.2d 1142 (Pa.Super.1998), *appeal dismissed as improvidently granted*, 560 Pa. 220, 743 A.2d 451 (2000) (holding trial court properly admitted evidence of pedestrian's alcohol consumption where (1) responding officer detected scent of alcohol on pedestrian's breath following accident; (2) hospital measured pedestrian's BAC level in excess of 0.25 percent within forty (40) minutes of accident; and (3) expert testimony established that, given BAC results, pedestrian's judgment and motor skills would have been severely impaired at time of accident); *Crosby v. Com., Dept. of Transp.*, 378 Pa.Super. 72, 548 A.2d 281 (1988) (holding evidence revealed more than mere hint of intoxication where (1) officer testified he smelled odor of alcohol on plaintiff; (2) plaintiff's BAC was 0.101 percent; (3) expert toxicologist opined plaintiff's BAC rendered him unfit to drive; and (4) plaintiff was familiar with road, but drove off of it, straight into tree); *Ackerman, supra* (holding trial court properly admitted evidence of intoxication, and such evidence was not prejudicial where (1) plaintiff's girlfriend and roommate stated plaintiff had been drinking beer since late afternoon on day of accident; (2) defendant and medical personnel testified plaintiff strongly smelled of beer; (3) plaintiff's BAC was 0.195 percent; (4) hospital records revealed plaintiff admitted drinking heavily; and (5) plaintiff had slurred speech and low level of alertness following accident). *But see Locke, supra* (holding evidence of intoxication was inadmissible at trial where (1) responding officer smelled beer on plaintiff's breath; (2) plaintiff's BAC was 0.06 percent; and (3) expert failed to explain effects such alcohol would have on plaintiff; rather, expert merely opined plaintiff would be more sensitive to effects of alcohol because he was legally underage); *Whyte, supra* (holding evidence of intoxication was inadmissible at trial where (1) defendant smelled alcohol on plaintiff's breath, although all other witnesses did not; and (2) plaintiff's doctor smelled alcohol on plaintiff's breath upon examination three hours later).

■ ¶ 21 Hospital records are routinely admitted in negligence actions to show the event of hospitalization, treatment prescribed, symptoms found, and/or the existence of some readily ascertainable substance or chemical within the body. *Williams v. McClain*, 513 Pa. 300, 305, 520 A.2d 1374, 1376 (1987). When a record is offered merely to prove these facts, there are no doubts concerning the record's reliability and accuracy. *Id.* at 306, 520 A.2d at 1376.

¶ 22 This Court explained:

> The practice of recording facts has been standardized in the modern hospital and these recorded facts are routinely used to make decisions upon which the health and life of the patient depend. Current experience teaches the practice of drawing and testing blood for alcohol content is a matter particularly within the ambit of basic and routine hospital procedure. The standardized, precise calculations used at arriving at a final result leave little room for error.

*Commonwealth v. Kravontka*, 384 Pa.Super. 346, 558 A.2d 865, 869 (1989). *See also Commonwealth v. Alarie*, 378 Pa.Super. 11, 547 A.2d 1252 (1988), *appeal denied*, 521 Pa. 616, 557 A.2d 720 (1989) (explaining allegations of problems in chain of custody go to weight of evidence; jury has duty to balance allegations of improper chain of custody against reasonable inference of unaltered chain of custody).

¶ 23 Instantly, Mr. Braun consumed alcohol during his lunch break on the day of the accident. (*See* N.T. Trial, 3/2/06, at 74; R.R. at 898a). Upon return to the con-

struction site, Mr. Braun ascended eighteen feet on a scissor lift platform and inexplicably did not utilize the readily accessible safety equipment to tie off. (*Id.* at 71; R.R. at 895a). Mr. Braun suddenly exited the scissor lift without having tied off; however, testimony from both Mr. Braun's supervisor at the construction site and Mr. Braun's co-worker established Mr. Braun had no reason to leave the railed platform to perform his work. (*Id.* at 33, 77; R.R. at 632a–633a, 901a). Furthermore, the trial testimony established that Mr. Braun had been drinking throughout the day before the accident. (*Id.* at 161–62; R.R. at 985a–986a).

¶ 24 Mr. Braun's blood alcohol level was 0.27 percent. (*Id.* at 126–28; R.R. at 950a–952a). Dr. Brian Pape, Target's toxicology expert, opined that Mr. Braun's high BAC level drastically increased his risk of a fall. (*Id.* at 137; R.R. at 961a). Dr. Pape stated his opinion as follows:

> [I] would expect that he was impaired physically and impaired behaviorally. He was not necessarily impaired to such an extent that those effects were visible.... Let me be rather direct, at a[BAC] greater than .20, everyone would be under the influence of alcohol and impaired by alcohol physically and behaviorally. Those impairments might not be visible or obvious stumbling, slobbering, smacking somebody in the face, or talking in dirty obscene terms to them, or doing something out of character, but the person would certainly be impaired.
>
> And the individual would be at an [extraordinarily] increased risk of accident, including slip or fall accidents, extraordinarily increased risk.

(*Id.* at 137; R.R. at 961a–963a). Dr. Pape further explained that an individual with a greater alcohol tolerance might not exhibit visible or obvious signs of impairment, even if the individual were significantly impaired. (*Id.* at 141; R.R. at 965a).

¶ 25 Although there is scant case law regarding the admissibility of evidence relating to alcohol consumption in the civil negligence scenario, the graveman of the admissibility question is whether evidence of Mr. Braun's intoxication and BAC result was relevant to prove his unfitness to perform work eighteen feet above ground. *See Fisher, supra; Locke, supra; Ackerman, supra.* Target presented the following evidence concerning Mr. Braun's intoxication: (1) Appellant admitted Mr. Braun consumed alcohol throughout the day before the accident; (2) witnesses observed Mr. Braun drink beer at lunch shortly before the accident; (3) Mr. Braun ascended eighteen feet above ground on a scissor lift and failed to tie off, even though safety equipment on the railed platform was readily accessible to him; (4) Mr. Braun inexplicably and unnecessarily stepped off of the railed platform onto an eight inch wide steel beam; (5) Mr. Braun's BAC was 0.27 percent; and (6) Dr. Pape opined Mr. Braun's high BAC level would render him physically and behaviorally impaired and drastically increase his risk of falling. Under these facts, this evidence suggests more than a mere hint of intoxication. *See* Crosby, supra. Thus, we see no error in the admission at trial of evidence of Mr. Braun's alcohol consumption.

¶ 26 With regard to his chain-of-custody issue, Mr. Braun arrived at the hospital as a trauma-alert patient. (*See* Trauma Record, 11/29/02, at 1; R.R. at 368a). Pursuant to trauma-alert protocol, hospital personnel drew Mr. Braun's blood, gave him a patient number, and initially registered him as a John Doe patient. Upon learning Mr. Braun's identification, his medical reports carried his correct name as well as the original patient number. Dr. Pape reviewed the accident re-

port, post-accident medical records, including Mr. Braun's BAC results, statements and deposition transcripts from Appellant, Mr. Braun's co-workers, nurses, Emergency Room staff, and laboratory staff at Frankford Hospital, among other documents. (*See* N.T. Trial, 3/2/06, at 122; R.R. at 946a). After explaining Frankford Hospital's protocol for trauma-alert patients at length, Dr. Pape summarized his opinion regarding the reliability of the procedures used as follows: When you consider everything that I know about Frankford Hospital, and their conduct and certification of the test, and their use of the test equipment and their use of this specific alcohol test based on alcohol dehydrogenates, there's no reason to conduct a duplicate test. The tests are highly reliable. (*See id.* at 135–36; R.R. at 959a–960a). Further, Dr. Pape opined that he did not see anything extraordinary or inconsistent with the chain of custody performed as to Mr. Braun's blood test. (*Id.*) Appellant failed to present rebuttal evidence to challenge the chain of custody in handling Mr. Braun's blood specimen.[7] As such, Appellant's first and second issues merit no relief.

¶ 27 In her third issue, Appellant maintains JMB did not establish the elements necessary to assert the statutory employer defense as set forth in *McDonald v. Levinson Steel Co.*, 302 Pa. 287, 153 A. 424 (1930). Appellant argues JMB was merely an employee at will; Target could fire JMB at any time, for any reason; and JMB was not the general contractor for Target. Appellant asserts Target was involved with and retained the right to control every phase of the construction process; Target, not JMB, controlled the premises. Appellant also argues JMB lacked the authority to subcontract with Lindstrom, as Target retained authority and control over subcontractors. Appellant insists JMB failed to establish that its contract with Target specifically authorized JMB to subcontract for the performance of steel erection work; and JMB presented no evidence of any contract entrusting part of JMB's regular business to Lindstrom. Appellant declares the elements of the *McDonald* test are subject to strict construction, and the court should not have granted JMB statutory employer status on the facts averred. Appellant concludes the trial court erred when it granted a compulsory nonsuit in favor of JMB based upon JMB's statutory employer status and when it refused to remove the nonsuit.

¶ 28 In response, JMB argues it did have a contract with Target, which Appellant had moved into evidence, and the court accepted. JMB asserts the contract specifically delineated the rights and responsibilities of the respective parties, whereby JMB was the designated general contractor for Target. JMB insists Appellant's reference to JMB as an employee of Target is misplaced, as the terms of the contract belie this claim.[8] JMB maintains its contract with Target and subcontract with Lindstrom satisfied the vertical privity necessary for statutory employer status. JMB declares its Project Manager was on the construction site everyday, and JMB kept a trailer on site. JMB contends it

---

7. Notably, the court specifically invited Appellant to call her expert, Dr. Lee Blum, to discredit the hospital record and/or Dr. Pape's testimony on rebuttal. (Pretrial Hearing, 2/16/02, at 23–24, 70; R.R. at 474a–475a, 521a). Appellant nevertheless failed to call her expert or any hospital personnel to testify and relied solely on the cross-examination of Dr. Pape.

8. Notably, Appellant's complaint alleged JMB was a general contractor, building/construction manager, not an employee. (Complaint, 5/20/04, at 8; R.R. at 40a).

occupied the premises for purposes of the *McDonald* test.

¶ 29 JMB further argues its subcontract with Lindstrom provided that Lindstrom was on site to erect steel. JMB avers the subcontract specified Lindstrom's responsibility for safety on the site and claims witness testimony confirmed that, even in the absence of a written contract, Lindstrom understood its duties on the job site. JMB stresses its job was to build a building. Pursuant to its contract with Target, JMB could subcontract with others for various portions of the work. JMB emphasizes steel erection was part of the business of erecting this building, which involved obtaining a subcontractor to perform some portion of the work. JMB entrusted part of its regular business to Lindstrom. JMB affirms it established each prong of the *McDonald* test and was entitled to statutory employer immunity. JMB concludes this Court should sustain the order denying Appellant's post-trial motion to remove the compulsory nonsuit entered in JMB's favor. We agree.

■■■■ ¶ 30 The standard of review on appeal from the denial of a motion to remove a compulsory nonsuit is as follows:

> The plaintiff must be allowed the benefit of all favorable evidence and reasonable inferences arising therefrom, and any conflicts in the evidence must be resolved in favor of plaintiff. Further, [i]t has been long settled that a compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established. However where it is clear a cause of action has not been established, a compulsory nonsuit is proper. We must, therefore, review the evidence to determine whether the order entering judgment of compulsory nonsuit was proper.

*Wu v. Spence,* 413 Pa.Super. 352, 605 A.2d 395, 396 (1992), *appeal dismissed as im-*

*providently granted,* 534 Pa. 309, 632 A.2d 1294 (1993) (internal citations omitted).

¶ 31 The Pennsylvania Supreme Court established a five-prong test in *McDonald* to determine whether statutory employer immunity exists as follows:

> To create the relation of statutory employer under section 203 of the act (77 PS § 52), all of the following elements essential to a statutory employer's liability must be present: (1) An employer who is under contract with an owner or one in the position of an owner. (2) Premises occupied by or under the control of such employer. (3) A subcontract made by such employer. (4) Part of the employer's regular business [e]ntrusted to such subcontractor. (5) An employee of such subcontractor.

■■■■ *McDonald, supra* at 294–95, 153 A. at 426. Under the second prong of *McDonald,* [a]n employer's occupancy or control must be actual, but need not be exclusive. *Kelly v. Thackray Crane Rental, Inc.,* 874 A.2d 649, 656 (Pa.Super.2005), *appeal denied,* 586 Pa. 740, 891 A.2d 733 (2005) (citing *Emery v. Leavesly McCollum,* 725 A.2d 807 (Pa.Super.1999)). An employer satisfies the second prong by proving either occupancy **or** control and it is not required to prove both. *Id.* (emphasis added). Regarding the fourth prong, this statutory requirement is met when the subcontracted work is an obligation assumed by a principal contractor under its contract with the owner, or one in the position of an owner. *McCarthy v. Dan Lepore & Sons Co., Inc.,* 724 A.2d 938, 943 (Pa.Super.1998), *appeal denied,* 560 Pa. 707, 743 A.2d 921 (1999).

■■■ ¶ 32 The classic statutory employer situation is in the construction industry, where a property owner hires the general contractor, who hires a subcontractor to do specialized work on the jobsite, and an

employee of the subcontractor is injured in the course of his employment. *Peck v. Delaware County Bd. of Prison Inspectors*, 572 Pa. 249, 255, 814 A.2d 185, 189 (2002). In those situations, the general contractor who meets the five-part *McDonald* test qualifies as the statutory employer of the subcontractor's employee, and is immune from suit by that employee. *Id.* Moreover, [u]nder the Pennsylvania Workers' Compensation Act, a contractor need not be the general contractor on a construction project to qualify as a statutory employer. *McCarthy, supra* at 941. A contractor who is not the general contractor may still qualify for statutory employer status so long as the contractor can establish the elements of the *McDonald* test. *Id.*

¶ 33 Instantly, this case implicates the *McDonald* test. Under the contract between Target and JMB, Target was the owner, or in the position of an owner, of the construction site. Additionally, Mr. Braun was an employee of Lindstrom who was a subcontractor for JMB. Thus, JMB undisputedly satisfied the first and fifth prongs under *McDonald.*

¶ 34 Regarding the second prong, witness testimony established that JMB's Project Manager, Todd Seidel, was on site everyday and easy to locate if needed. (*See* N.T. Trial, 2/27/06, at 67; Supp.R.R. at 430b). JMB also kept a trailer on site. (*Id.*) As the second prong is disjunctive and requires only occupancy or control, JMB met the occupancy portion of this prong. *See McDonald, supra; Kelly, supra; Emery, supra.*

¶ 35 JMB subcontracted with Lindstrom to begin the steel erection portion of the construction project for Target on September 30, 2002. (*See* N.T. Trial, 2/27/06, at 86; Supp.R.R. at 449b). The terms of the subcontract specified that JMB retained direct authority over Lindstrom and that Lindstrom shall deal directly with JMB regarding any phase of performance of its subcontract. (*See id.* at 95–96; Supp.R.R. at 458b–459b). The court admitted the subcontract into evidence at the close of Appellant's case-in-chief. (*See* N.T. Trial, 3/2/06, at 59; R.R. at 883a). JMB satisfied the third prong of *McDonald. See McDonald, supra.*

¶ 36 Target's contract with JMB obligated JMB to undertake various tasks to accomplish the general goal of constructing the Target building. (*See* N.T. Trial, 2/24/06, at 97; R.R. at 696a). Witness testimony established that steel erection is part of the regular business of constructing a building. (*See id.* at 39; R.R. at 638a). JMB subcontracted with Lindstrom for this portion of the work, thereby entrusting Lindstrom with part of JMB's regular business. JMB met the fourth prong under *McDonald. See McDonald, supra; McCarthy, supra.* Thus, JMB established it was entitled to statutory employer immunity, and Appellant's third issue merits no relief.

¶ 37 In Appellant's fourth and fifth issues, Appellant argues the court improperly limited testimony concerning safety standards to OSHA regulations. Appellant asserts the court precluded her from presenting evidence relating to other safety standards in the construction industry. Appellant claims JMB was responsible for safety precautions on the job site. Appellant insists JMB implemented more stringent safety standards on previous construction jobs than it utilized on the Target project. Appellant maintains the court precluded her from presenting safety standards relating to fall protection under the American National Standards Institute (ANSI). Appellant insists, in other words, the court denied her the opportunity to present the jury with alternative safety

standards necessary to determine whether JMB's security precautions fell below industry safety standards.

¶ 38 Appellant further alleges JMB's safety director, Dawn Paralis, admitted JMB had violated safety standards under OSHA. Appellant claims other testimony established that Target controlled various aspects of JMB's construction; thus, under agency principles, Target was vicariously liable for JMB's negligence. Appellant concludes there was no sufficient competent evidence to sustain the verdict in favor of Target; therefore, this Court must reverse with instructions to the trial court to enter JNOV in favor of Appellant on the issue of Target's negligence, and to conduct a new trial limited to causation and damages as to Target. We disagree.

¶ 39 Instantly, the record belies Appellant's assertions. Target's contract with JMB specified OSHA regulations as the operative safety standards for construction of this Target store. (*See* General Conditions of the Contract for Construction, 3/1/02, at 19; Supp.R.R. at 198c). During Appellant's case-in-chief, Appellees objected to the presentation of safety standards other than OSHA regulations. The court stated:

> [ANSI and other customary safety standards are] not in this case. They're not the standards. If you're talking about any standards or regulations, the standards and regulations applicable to this case are OSHA. It's been agreed to. That's why you've been talking about it so much. Any other standards or regulations are not applicable to this case. However, common law negligence is, and you can do that a million different ways. However you want to do it, I don't care, I'm not going to argue about it. But they can't cite [Appellees] for violation of some construction regulation or standard other than OSHA.

(*See* N.T. Trial, 2/27/06, at 30–31; Supp. R.R. at 393b–394b). The court explained Appellant could not use safety standards other than OSHA to establish negligence *per se.* The court, however, expressly allowed Appellant to present alternative safety standards under the theory of common law negligence. Appellant simply failed to follow through in her case-in-chief. Thus, Appellant's assertion merits no further attention.

¶ 40 The record also belies Appellant's proposition that JMB admitted it had violated an OSHA regulation. Appellant fails to cite to the certified record where this purported admission occurred. On direct examination, Appellant's counsel asked Dawn Paralis: **If** the person is simply wearing a harness and a lanyard and had nowhere to tie off **would that be** an OSHA violation. (*See id.* at 26; Supp.R.R. at 397b). Ms. Paralis responded: Yes. (*See id.*) Ms. Paralis was responding to a hypothetical question. Appellant's pure reliance on Ms. Paralis' answer to a hypothetical question is misplaced. Moreover, the record makes clear Mr. Braun had no reason to be out on the beam in the first place and could have tied off to the accessible anchorage on the railed platform. Thus, Appellant's fourth and fifth issues merit no relief. Based upon the foregoing, we affirm the judgments entered in favor of Target and JMB.

¶ 41 Judgments affirmed.