Reuschel v. Land Rover North America, Inc.

*Steven N. Cherry,* for plaintiff.
*James R. Peterson,* for defendants.

ALBRIGHT, *J.,* May 24, 2011—The defendant, Rovmain, Inc., f/k/a Land Rover Main Line ("Rovmain"), appeals from the entry of judgment by the Montgomery County prothonotary on January 15, 2010, in favor of the plaintiff, Michael J. Reuschel, and against the defendant Rovmain in the amount of $33,330.51.[1] For the reasons that follow, the undersigned believes that the entry of judgment against the named defendant should be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 3, 2000, the plaintiff, Michael J. Reuschel,

---

1. By order dated June 13, 2007, senior Judge Clark denied the defendant's post-trial motion, "seeking Judgment N.O.V. or...a new trial." Following a bench trial and the court's findings in favor of the plaintiff and against the defendant Rovmain.

and the defendant Rovmain entered into a formal written Land Rover Financial Services Motor Vehicle Lease Agreement (the "lease") providing for Mr. Reuschel's lease of a 2000 Land Rover 4.0LSE automobile for a term of forty-two (42) months. As required by the lease, the plaintiff paid an $8,000.00 down payment to defendant Rovmain. Following the inception of the Lease, the plaintiff took possession of the vehicle and began making the agreed upon lease payments to Land Rover Financial Services, a wholly-owned subsidiary of BMW Financial Services. [N.T. 4/29/07, at 82]

It was not long afterward, however, until the plaintiff's leased vehicle began to experience a variety of mechanical and electronic problems, reportedly related to a malfunctioning of the car's Electronic Air Suspense System ("EAS system"). When subsequent multiple attempts by the defendant to repair the vehicle's faulty EAS system proved fruitless, the plaintiff reported that, on July 17, 2000, the defendant's general manager, Mr. Damien Tak Paperiello, advised him that the defendant was prepared to either provide him with a new Land Rover 4.0LSE and continue the lease or terminate the lease and return Mr. Reuschel's $8,000.00 down payment. [N.T. 4/9/07, at 65, 81, 91] The plaintiff related further a similar offer from a Mr. Brad Miller, a service advisor working at one of the defendant's dealerships, to "swap out a new car," made following the leased vehicle's return for yet another of the many service appointments scheduled by the defendant to fix the Land Rover's EAS system. [N.T. 4/9/07, at 64]

During this time, the plaintiff informed Rovmain and,

specifically, Mr. Paperiello that he would be moving to Florida and needed his replacement Land Rover before his anticipated move at the "very end of July" 2000. [N.T.4/9/07, at 27,65] According to the plaintiff, Mr. Paperiello was unable to find a comparable substitute Land Rover for him, resulting in Mr. Reuschel's acceptance of Rovmain's offer to refund his $8,000.00 deposit and terminate the parties' lease. [N.T. 4/9/07, at 69] The plaintiff related that, before moving to Florida, he spoke with defendant's General Manager, Mr. Paperiello, by telephone and told him that he was "going to drop the car off at the dealership." [N.T. 4/9/07, at 70-71] Thereafter, in keeping with his prior practice followed after scheduling his car for service and/or repairs, Mr. Reuschel dropped the leased Land Rover at Rovmain's service parking lot "after hours" and left the car keys in the "drop box" provided by Rovmain. [N.T. 4/9/07, at 70, 94] Before departing for Florida, Mr. Reuschel, by letter dated July 24, 2000, wrote, "I am choosing to get my down payment back .... I am invoking the Pennsylvania Lemon Law and I would like my $8,000.00 down payment refunded to me at my Florida address." [A. Compl. at Ex. "B" (Reuschel Ltr., 7/24/00)]

Thereafter, assuming that he had effectively terminated his Land Rover Lease by returning it to Rovmain, Mr. Reuschel moved to Florida and made no further payments on the lease to BMW Financial Services. Nevertheless, Mr. Reuschel continued to receive monthly invoices, forwarded to his Florida address several weeks or months after their issuance, from BMW Financial Services seeking lease payments and accumulating late fees

charged to those payments not made and alleged to be overdue. [N.T. 4/9/07, at 71-72, 94] Upon receipt of these BMW Financial Services notices, the plaintiff testified that he would customarily contact Tom Langley at Land Rover Financial Services, who would, inevitably, advise the plaintiff that "I'll do whatever I can to help you. I understand you turned it in, I will get this thing stopped.'" [N.T. 4/9/07, at 72, 82] The plaintiff admitted that he continued to receive statements and invoices from BMW Financial Services, seeking payment of the alleged unpaid and overdue car lease payments, but that he, nonetheless, maintained the belief that he was not legally required to pay anything since the lease had been terminated and the leased car returned to the lessor defendant; that, surely, any continued billing for lease payments alleged to be due and/or overdue was attributable only to administrative oversight or error by the defendant. [N.T. 4/9/07, at 72, 81-83] Mr. Reuschel was particularly upset when, in "early 2001," he received a statement, dated April 10, 2001, from Land Rover Financial Services reflecting a balance of $7,965.46 due on the Land Rover lease, despite the fact that he had returned the vehicle to Rovmain many months prior. [N.T. 4/9/07, at 73-74, 93; Pl.'s Ex. 13]

Equally, if not more disquieting to the plaintiff was the action eventually taken by Land Rover Financial Services in notifying various credit reporting agencies of its repossession of the leased vehicle and the purported delinquency of Mr. Reuschel in making his lease payments, which, in turn negatively impacted the latter's credit score and overall credit rating. [N.T. 4/9/07, at 75] Apparently, without Mr. Reuschel's knowledge, but as a consequence

of his failure to respond to its repeated requests for payment, BMW Financial Services repossessed his Land Rover after locating the vehicle at Rovmain's premises. [N.T. 4/9/07, at 75]

It was not until after the plaintiff had concluded his business in Florida and was preparing to return to Pennsylvania in the spring of 2001 that he became aware of the import of what had been occurring in the Keystone State. Hoping to prequalify for a mortgage to assist him in the purchase of a new home in Pennsylvania, Mr. Reuschel discovered that his prior exemplary credit rating had been so severely and negatively impacted by BMW Financial Services' repossession report that he was denied access to prevailing interest rates then available to borrowers seeking home financing. [N.T. 4/9/07, at 74] The plaintiff's mortgage broker informed the plaintiff that his credit was "bad" and "in the low six hundreds," as a consequence of which, in August 2001, despite his historically strong credit score, Mr. Reuschel was only able to secure a $756,800 mortgage with a 10.25 percent interest rate to finance his purchase of his Pennsylvania residence. [N.T. 4/9/07, at 75-76, 176] Eventually, however, the plaintiff was able to refinance that same mortgage in January 2003 at the much lower interest rate of 6.875 percent. [N.T. 4/9/07, at 98, 176]

On September 18, 2001, Mr. Reuschel initiated the subject lawsuit against the above-named defendants, seeking to recover the $8,000.00 down monies paid by him at the outset of the Land Rover Lease Agreement, as well as other damages sustained by him due to the

lowering of his credit score caused by the unjustified and improper reporting of his alleged default on that agreement. Thereafter, the case was determined to be ready for trial and assigned to Senior Judge Ward F. Clark (now deceased), who, sitting without a jury on April 9, 2007, returned the following verdict:

> I find in favor of the plaintiff in the amount of $8,000.00 which is the payment on account of the lease, plus $25,330.51, as I find the Rovmain, Inc., Land Rover Main Line responsible for starting the ball rolling that resulted in his credit rating being adversely affected by BMW and Land Rover Financial Services, same entity, to the tune of, as I said $25,330.51.

> I find against the plaintiff for the $7,965.46. I find against the plaintiff for any request for attorneys fees. I'll impose the cost of this litigation on both parties. They will assume their own cost.

> I find in favor of Land Rover North America, Inc. and they're not responsible for any of these damages.

[N.T. 4/9/07, at 207-208].

On April 19, 2007, Rovmain filed a motion for post-trial relief, "seeking Judgment N.O.V. or in the alternative, a new trial," which was denied by Senior Judge Clark on June 13, 2007.[2] On July 13, 2007, defendant Rovmain filed a notice of appeal from the trial court's order denying its post-trial motion; that appeal was quashed, however, by the Pennsylvania Superior Court after determining that

---

2. Senior Judge Clark's June 13, 2007 order was not docketed until July 12, 2007.

the judgment had not been entered in the matter on the trial court's docket as required by Pa.R.A.P. 301.

The case appeared to languish until January 15, 2010, when judgment was finally entered by the plaintiff, thereby precipitating the subsequent filing of this appeal by Rovmain on February 12, 2010. Service of the notice of appeal was apparently made upon Senior Judge Clark, whose unfortunate death, however, resulted in the eventual transfer of this case to the undersigned on August 4, 2010. On August 30, 2010, in response to the trial court's Pa. R.A.P. 1925(b) request, Rovmain filed and served upon the undersigned its concise statement of matters complained of on appeal (Pa.R.A.P. "1925(b) statement"), which asserted the following:

1. The trial court committed error of law and/or abuse of discretion by permitting Dennis Kindling [sic] to testify as an expert at trial, as Mr. Kindling [sic] was never previously identified as such, resulting in unfair prejudice to defendant Rovmain.

2. The trial court improperly permitted and relied upon the expert testimony of Dennis Kindling [sic] with respect to the calculation of plaintiff's claimed damages, even though Kindling [sic] clearly and unequivocally testified that it was not him, but rather mortgage underwriters, that made the ultimate decision whether the plaintiff would be approved for a mortgage, and at what interest rate.

3. The verdict of the Trial court was against the weight of the evidence, as plaintiff acknowledged

that is was not Rovmain that made reports to credit reporting agencies regarding late payments and repossession; plaintiff acknowledged that he did not make lease payments to Rovmain; Rovmain did not repossess the Range Rover; plaintiff failed to establish that Rovmain was responsible for any of his claimed monetary damages on any cognizable legal basis; Dennis Kindling acknowledged that plaintiff had other adverse credit history; and Dennis Kindling could not say what plaintiff's credit score would have been if not for the entries by BMW Financial.

## DISCUSSION

A judgment notwithstanding the verdict (JNOV) may only be entered where the movant is entitled to judgment as a matter of law and/or where the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. *Braun v. Target Corp.*, 983 A.2d 752, 759 (Pa. Super. 2009). The standard of review for the denial of a post-trial motion seeking judgment notwithstanding the verdict, or, in the alternative, a new trial is well-established and limited to determining whether the trial court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. *Braun*, 983 A.2d at 760. An abuse of discretion is not merely an error of judgment, but, instead, occurs when the law is overridden, misapplied, or exercised in a manner that is manifestly unreasonable or results in an outcome attributable to partiality, prejudice, bias or ill-will. *Sutherland v. Mononghela Valley Hosp.*, 856 A.2d 55, 59 (Pa. Super. 2004) (internal citation omitted). To determine whether the trial court abused

its discretion or committed an error of law, the appellate court's analysis should include consideration of whether, when viewing the evidence in the light most favorable to the verdict winner, a new trial would have produced a different verdict. *Braun*, 983 A.2d at 760. Only where the verdict is found to be "so contrary to the evidence as to shock one's sense of justice" should a new trial be awarded, regardless of whether the evidence is conflicting or "the court might have reached a different conclusion on the same facts." *Id.* at 760 (internal citation omitted). Indeed, where the record contains evidence sufficient to support a trial court's credibility finding, the appellate court will not substitute its judgment for that of the finder of fact. *In Re Lokuta*, 608 Pa. 223, 255, 11 A.3d 427, 446 (Pa. 2011).

## *The Trial Court Properly Admitted Dennis Kinslow's Expert Testimony.*

Rovmain contends that the trial court erred in permitting the plaintiff's mortgage loan officer, Dennis Kinslow, to testify as an expert on the basis that the plaintiff had previously indicated in his pre-trial memorandum that he did not intend to call any expert witnesses.[3] In objecting to the admission of Mr. Kinslow's testimony, the defendant asserted that the witness was not qualified to testify as to causation because it is the underwriter and not the mortgage loan officer who makes the ultimate decision as to what interest rate be made available to a prospective

---

3. The plaintiff sought the admission of Dennis Kinslow's testimony to clarify the plaintiff's mortgage pre-approval experience, including the impact that the late payments to BMW Financial Services and ultimate repossession by BMW Financial Services, had on the plaintiff's credit score.

borrower. Rovmain, therefore, asserts that any testimony about the various factors used to calculate the interest rate offered to the plaintiff would be beyond the scope of Mr. Kinslow's alleged expertise. At trial, Senior Judge Clark overruled Rovmain's objection, permitted Mr. Kinslow to testify as an expert on the mortgage approval process, and stated that he would determine the weight to be given to the witness's testimony when considering all of the evidence produced in the case. See *Novitski v. Rusak,* 941 A.2d 43, 49 (Pa. Super. 2008).

The Pennsylvania Rules of Evidence vest the court with sound discretion to make determinations governing the admission or exclusion of evidence at trial. Pa.R.E. 702; *Rettger v. UPMC Shadyside,* 991 A.2d 915, 925 (Pa. Super. 2010). It is well-settled that a liberal standard applies to the admission of expert testimony. *Rettger,* 991 A.2d at 930. Expert testimony is not restricted to the testimony of the best qualified individual to provide such testimony; rather, all that is required is that an individual have a reasonable pretension of specialized knowledge on the subject under investigation to qualify as an expert. *Novitski,* 941 A.2d at 49. In determining whether a witness may testify as an expert, the trial court must determine whether that witness has "sufficient skill, knowledge, or experience in the field at issue as to make it appear that the opinion or inference offered will probably aid the trier of fact in the search for the truth." *Rettger,* 991 A.2d at 930 (internal citation omitted).

In this case, Mr. Kinslow testified that he had been employed by Trident Mortgage Company as a mortgage loan officer or consultant for twenty-four years. [N.T.

4/9/07, at 153] He described the scope of his employment, stating, "I generally work with the real estate agents in prequalifying, preapproving, arranging for the financing, discussing and consulting with the clients on interest rates and products that are both best suited for them; and upon closing we attend -- I attend the closing with the customer." [N.T. 4/9/07, at 153] As part of his job, Mr. Kinslow explained that his responsibilities included the evaluation of an applicant's creditworthiness by examining certain criteria including the applicant's income, asset and credit information and the potential loan-to-value ratio. [N.T. 4/9/07, at 157] Mr. Kinlsow testified that the plaintiff received a mortgage with 10.25 percent interest rate because he was considered a "sub-prime candidate for financing" in early 2001. In addition, Mr. Kinslow opined that, had it not been for Mr. Reuschel's low credit score, he would have qualified for a mortgage with a 7.5 percent interest rate. [N.T. 4/9/07, at 168]

Having acquired specialized knowledge in the area of the mortgage approval process through his twenty-four years of experience as a mortgage consultant, the trial court properly permitted and presumably relied upon Mr. Kinslow's expert testimony.

### The Weight of the Evidence Supported the Verdict

Rovmain also claims that the trial court's verdict in this case was against the weight of the evidence. More specifically, Rovmain asserts that BMW Financial Services was the entity responsible for repossessing the plaintiff's Land Rover, reporting that repossession to the credit agencies, and ultimately damaging the plaintiff's

credit score to the extent that Mr. Reuschel was denied the opportunity of securing, minimally, his $756,800.00 mortgage at the prevailing interest rate being offered at the time. Despite the fact that BMW Financial Services was the party that initiated the repossession proceedings and allegedly reported its actions to various credit agencies, the trial judge determined that the plaintiff presented sufficient evidence to establish that Rovmain was "responsible for starting the ball rolling that resulted in his [Mr. Reuschel's] credit rating being adversely affected by BMW and Land Rover Financial Services...to the tune of...$25,330.51." [N.T. 4/9/07, at 207]

The credibility of the parties and witnesses in this case presumably weighs heavily in the fact-finder's decision-making process. See *In Re Lokuta* at 255, 11 A.3d at 446 (holding that an appellate court will not disturb a trial court's credibility findings.). Given the trial judge's verdict, one might quite easily infer that Senior Judge Clark found the plaintiff's testimony to be more credible than that of Mr. Paperiello. Given Mr. Paperiello's admission at trial that, as of July 24, 2000 at the latest, the plaintiff was no longer in possession of his Land Rover and that the vehicle had, in fact, been left on Rovmain's property, the trial court took into consideration what it apparently perceived to be Rovmain's unwarranted intransigence in failing to respond to the justified complaints of its customer and become actively involved in some effort to mitigate the harm sustained by Mr. Reuschel, and, perhaps, rectify a situation where the customer had been short-changed. The Land Rover had, after all, presumably remained at or on Rovmain's premises for months following its return

by Mr. Reuschel in July 2000, remaining there until BMW Financial Services finally retrieved the vehicle and transported it to the Manheim Auto Auction, where it was sold on March 29, 2001. [N.T. 4/9/07, at 19-20] Certainly, when employing the standard of review to be utilized in this matter, the trial judge's verdict was not "so contrary to the evidence as to shock one's sense of justice," and defendant Rovmain's motion for post-trial relief was properly denied. See *Braun*, 983 A.2d at 760 (internal citation omitted).

## CONCLUSION

For all of the aforementioned reasons, the trial court believes that the order of the trial court, dated June 13, 2007, denying the defendant's motion for post-trial relief was proper, and the entry of judgment in favor of the plaintiff, Michael J. Reuschel, and against the defendant, Rovmain, Inc. f/k/a Land Rover Main Line, in the amount of $33,330.51 should affirmed.