532 A.2d 1179

**Mary Jane GALLAGHER, Administratrix of the Estate of William E. Gallagher, Deceased, Appellant,**

**v.**

**Dr. ING, H.C.F. Porsche KG and Foreign Wheels, Inc. and Bob Fox t/a Bob Fox Porsche Service, Appellees.**

**Mary Jane GALLAGHER, Administratrix of the Estate of William E. Gallagher, Deceased, Appellant,**

**v.**

**VOLKSWAGEN OF AMERICA, INC., Foreign Wheels, Inc. and Bob Fox t/a Bob Fox Porsche Service, Appellees.**

Superior Court of Pennsylvania.

Argued May 6, 1987.

Filed Oct. 20, 1987.

348

Francis J. Moran, Philadelphia, for appellant.

Joseph V. Pinto, Philadelphia, for appellees.

Before BROSKY, WIEAND and BECK, JJ.

WIEAND, Judge:

William E. Gallagher was killed when the Porsche which he was operating failed to negotiate a curve in a narrow road, left the roadway, struck a stone wall, and careened back into the roadway where it collided with an oncoming vehicle. In subsequent death actions the administratrix of his estate contended that the Porsche had been defectively designed. Volkswagen of America, Inc., the manufacturer, denied that there had been a design defect and presented evidence that Gallagher had lost control of the vehicle because he was intoxicated. The jury which heard the case returned a verdict in favor of the manufacturer, finding specifically that the vehicle had not been designed defectively.[1] Post-trial motions were denied, and judgment was entered on the verdict. The administratrix of the decedent's estate appealed. We affirm.

The accident occurred on February 6, 1979 at or about 9:00 p.m. on Morris Road, a narrow, winding road in Whitpain Township, Montgomery County. Witnesses testified that Gallagher had passed them at a high rate of speed approximately one mile from the scene of the accident and had accelerated after completing the pass. An analysis of a blood sample removed shortly after Gallagher had been pronounced dead revealed a blood alcohol content of .18 percent. Prior to the accident, Gallagher had been with friends where, during a period of approximately one hour and a half, he had been drinking scotch. A toxicologist opined, based on the alcoholic content of the decedent's blood, that he must have had at least six or seven drinks and was unfit to drive a motor vehicle.

Appellant moved pre-trial to exclude evidence of her decedent's consumption of alcohol on the day of the acci-

---

1. Claims against Foreign Wheels, Inc. and Bob Fox Porsche Service were settled prior to trial.

dent. The trial court received an offer of proof and on the basis thereof held that the evidence, if believed by a jury, was sufficient to show that Gallagher had been unfit to drive a vehicle safely. Therefore, the court ruled, the evidence was admissible. Appellant argues on appeal that the receipt of this evidence was erroneous.

In *Fisher v. Dye,* 386 Pa. 141, 125 A.2d 472 (1956), the Supreme Court pronounced the applicable law as follows:

[W]hile proof of intoxication is relevant where reckless or careless driving of an automobile is the matter at issue, the mere fact of drinking intoxicating liquor is not admissible, being unfairly prejudicial, unless it reasonably establishes a degree of intoxication which proves unfitness to drive.

*Id.,* 386 Pa. at 148, 125 A.2d at 476. See: *Billow v. Farmers Trust Co.,* 438 Pa. 514, 516–517, 266 A.2d 92, 93 (1970); *Morreale v. Prince,* 436 Pa. 51, 52, 258 A.2d 508, 508 (1969); *Cook v. Philadelphia Transportation Co.,* 414 Pa. 154, 159, 199 A.2d 446, 448 (1964); *Balla v. Sladek,* 381 Pa. 85, 93, 112 A.2d 156, 160 (1955); *Critzer v. Donovan,* 289 Pa. 381, 384–385, 137 A. 665, 666 (1927); *Hawthorne v. Dravo Corp.,* 352 Pa.Super. 359, 369, 508 A.2d 298, 303 (1986); *Ackerman v. Delcomico,* 336 Pa.Super. 569, 574–575, 486 A.2d 410, 413 (1984); *Emerick v. Carson,* 325 Pa.Super. 308, 313, 472 A.2d 1133, 1135 (1984); *Couts v. Ghion,* 281 Pa.Super. 135, 143, 421 A.2d 1184, 1188–1189 (1980); *Cusatis v. Reichert,* 267 Pa.Super. 247, 249–250, 406 A.2d 787, 788–789 (1979); *Schwarzbach v. Dunn,* 252 Pa. Super. 454, 461, 381 A.2d 1295, 1298 (1977). In *Billow v. Farmers Trust Co., supra,* the Court, by applying this standard to a case involving a fatal collision, held that an opinion by a physician that the decedent's blood alcohol content of .14 percent would have been sufficient "to affect his driving" was properly excluded because it failed to show " 'a degree of intoxication which proves unfitness to drive.' " *Id.* 438 Pa. at 517, 266 A.2d at 93, quoting *Morreale v. Prince, supra.*

Where the evidence of intoxication is such as to demonstrate an unfitness to drive, however, the evidence is admissible. "Our legislature has expressly approved the blood alcohol test as a means of determining whether a person is driving under the influence of intoxicating beverages. Indeed, a blood alcohol content of .10 percent or more of weight raises a presumption of intoxication. 75 Pa.C.S. § 1547(d)(3)." *Cusatis v. Reichert, supra* 267 Pa.Super. at 251–252, 406 A.2d at 789–790. See: *Beneshunas v. Independence Life & Accident Insurance Co.,* 354 Pa.Super. 391, 396, 512 A.2d 6, 8 (1986); *Ackerman v. Delcomico, supra* 336 Pa.Super. at 575–577, 486 A.2d at 414; *Emerick v. Carson, supra* 325 Pa.Super. at 313–314, 472 A.2d at 1135–1136; *Couts v. Ghion, supra* 281 Pa.Super. at 143–145, 421 A.2d at 1188–1189; *Schwarzbach v. Dunn, supra.*

It has been suggested in some of the decisions that a blood alcohol content of .10 percent or more, when standing alone, is insufficient to show a degree of intoxication which proves unfitness to drive and, therefore, is inadmissible. See: *Billow v. Farmers Trust Co., supra; Ackerman v. Delcomico, supra.* Assuming, without deciding, that a blood alcohol content, no matter how high, can be used only in conjunction with other evidence to show intoxication rendering a motorist unfit to drive, such a rule of law does not aid appellant in the instant case. Here, there was additional evidence, which was sufficient, if believed, to show that the decedent was unfit to drive a vehicle.

This additional evidence showed that the decedent had been drinking scotch for a period of approximately an hour and a half before getting in his car to drive home. He had mixed the drinks for himself, using a bottle of scotch purchased for him by friends who knew his fondness for scotch. Several witnesses observed the decedent driving at a high rate of speed on a dark, winding and hilly road approximately one mile from the scene of the accident. In addition to evidence that samples of decedent's blood revealed a blood alcohol content of .18 percent, Dr. Frederick Rieders, a toxicological expert, testified extensively regard-

ing the significance of such a high alcoholic content with respect to the decedent's ability to drive safely. He said:

[M]y opinion, based on reasonable scientific certainty, is that an individual with a circulating blood alcohol load reflected by a blood alcohol concentration of .18 percent is unfit to operate a motor vehicle safely or to drive safely for the following reasons ...

In an individual of this size, if that is his circulating blood alcohol level at the time of an accident, it means that he had circulating in his body at least seven drinks, between six and seven drinks, at least that many drinks ...

At this blood alcohol and at much lower blood alcohol levels than at .18 percent, virtually every—virtually every person, adult or child, man or woman, is markedly impaired with respect to their own normal state.

Now, impaired in what? There's marked impairment, first of all, and very importantly, of the sense of care and caution. People drink to be a little bit more carefree. Translated into this, this means a lessened sense of care and caution.

Less alertness, impairment of alertness, impairment of perception, visual perception, auditory perception, seeing things clearly, hearing things clearly. Judgment, very important and almost invariant reduction occurs even with much, much lower blood alcohol levels in the judgment that the person has, judging what does it mean that I see, hear or feel. That's what I mean by judgment, the response time, how quickly that person will respond to a stimulus, especially to an emergency stimulus.

And coordination, that means the coordination between muscles and nerves, all of these things are progressively and markedly impaired. And in terms of what this means in terms of operating a vehicle on the highway is that the experience of forensic toxicologists and probably also statisticians and everybody else says that our data indicate very strongly that this kind of a blood alcohol level, a

person's likelihood of being involved in a fatal accident is over 20 times greater than that of a sober person.

So this is why we can say with reasonable certainty that this blood alcohol level, regardless of how much the person had to drink to reach this, he's impaired to such a point that he's unfit to operate a motor vehicle safely. He can still drive it, obviously people do, but not safely. (N.T. 6/11/85, pp. 21–24).

The "other" evidence necessary to render admissible a blood alcohol content in excess of .10 percent, it has been held, may consist of expert testimony interpreting the significance of the results of blood alcohol tests with respect to unfitness to drive. See: *Beneshunas v. Independence Life & Accident Insurance Co., supra,* 354 Pa.Superior Ct. at 397 n. 1, 512 A.2d at 9 n. 1. It may also consist of lay testimony pertaining to conduct on the part of the actor which suggests intoxication, see: *Ackerman v. Delcomico, supra,* or, as the case law demonstrates, it may consist of both of these types of evidence combined. See: *Emerick v. Carson, supra; Couts v. Ghion, supra; Cusatis v. Reichert, supra.*

■ The trial court concluded that the evidence was sufficient to establish a degree of intoxication proving unfitness to drive and allowed the evidence of consumption of alcohol. We find no error therein. Contrary to appellant's contention, the evidence was not merely that the decedent had a blood alcohol reading of .18 percent. The evidence was sufficient, if believed, to show that the decedent was so intoxicated that he was incapable of driving safely and that this was the legal cause for his loss of control of the vehicle which he was driving.

■ Appellant complains that the trial court decided the admissibility issue without holding an evidentiary hearing to determine the sufficiency of the evidence to show the decedent's unfitness to drive. Although the decision in *Vignoli v. Standard Motor Freight, Inc.,* 418 Pa. 214, 210 A.2d 271 (1965) commended the trial judge in that case for hearing testimony out of the hearing of the jury, it did not

hold that an evidentiary hearing was the only way of determining the admissibility of intoxication evidence. The trial judge did not err in the instant case when she decided the admissibility issue on the basis of the appellee-defendant's offer of proof. Moreover and in any event, the proof of the pudding is in the eating. The record in this case demonstrates unequivocally that the evidence was sufficient to show a degree of intoxication rendering the decedent unfit to operate a motor vehicle. The trial court properly received it and allowed the jury to consider it. It was relevant to establish the cause of the fatal accident.

■ Appellant also contends that the results of the blood test should not have been received because the samples of the decedent's blood had not been properly drawn, stored and handled. There is no merit in this argument. The evidence showed that the blood samples had been drawn by Dr. Carl Hamsher, a licensed physician, shortly after decedent had been pronounced dead. Dr. Hamsher testified that the decedent's injuries had been in the region of his head and neck and that there were not extensive injuries to his chest or abdomen which might have caused contamination of a blood sample taken from the heart. Therefore, Dr. Hamsher removed blood from decedent's heart and placed it in two sterile, red-topped tubes. He gave the tubes to a nurse, whose duties required her to label the tubes and place them in the emergency room refrigerator. The following morning, Charles Thomas, the Acting Coroner, collected the labeled samples of the decedent's blood from a nurse, who had retrieved them from the refrigerator in the emergency room. After obtaining the same, Thomas examined decedent's body and observed no injuries to the chest or abdomen. He also checked the blood samples visually to ensure that they did not contain any debris. Having ascertained that the samples were satisfactory, Thomas returned to the Coroner's Office, where his assistant, Carl Hofheinz, transferred the samples into tubes provided in a Becton-Dic-

kinson kit[2] which contained a blood preservative. The samples were then mailed to the Pennsylvania State Laboratory, where they were tested and revealed a blood alcohol content of .18 percent.

■ Appellant argues that the blood test results should have been excluded because the blood samples were not drawn by the coroner. This, he contends, was required by Section 3749 of the Vehicle Code, 75 Pa.C.S.A. § 3749, which is entitled "Reports by coroners and examiners," and which requires in subsection (b) that coroners or medical examiners in each of the counties take blood or urine samples or both from the bodies of all drivers and pedestrians over 15 years of age who die within four hours following an accident. These samples are to be submitted to the Governor's Council on Drug and Alcohol Abuse. The statute, although intended to serve a valuable purpose, was not intended to alter the law of evidence by setting new standards by which to determine the admissibility of blood test evidence. The blood samples in the instant case were drawn by a licensed physician at the request of the coroner. Even the appellant has not suggested that the physician was unqualified to extract a blood sample or that the procedure which he adopted was faulty.

■ Appellant next argues that the results of the blood test should have been excluded because the samples were not placed in tubes provided in the Becton–Dickinson kit immediately upon extraction. This fact did not render the test results inadmissible. Applicable Department of Health regulations provide that blood specimens extracted from the body of a person killed in a motor vehicle accident "shall be collected with equipment prescribed by the Department of Health." 28 Pa.Code § 29.21(b)(1). In accordance with this regulation, the Department of Health, Bureau of Laboratories, distributed Becton–Dickinson kits to coroners throughout the state. These kits contained, inter alia, sterile con-

2. The Becton–Dickinson kit is commercially marketed and is designed for storage of postmortem blood samples. The kit has been approved by the Department of Health.

tainers and a blood preservative for use in storing blood samples until the time when they were tested. However, Dr. Martin Shoemaker, the Director of the Pennsylvania State Health Laboratory, testified that the Becton–Dickinson kit is only one of several methods for postmortem specimen collection and that there are other methods for collecting blood samples which are equally reliable. Dr. Shoemaker testified that refrigeration is an appropriate method of preserving blood samples for short periods of time such as that which elapsed in the instant case. Finally, Dr. Shoemaker testified that he had reviewed the collection and storage procedures employed in the instant case and had concluded that they were proper. We conclude, therefore, that the extraction of blood and the testing thereof were shown to be both accurate and reliable. The trial court did not err when it received the result of the blood test and allowed the jury to consider it.[3]

■ Dr. Frederick Rieders, an expert in toxicology, was asked hypothetically on direct examination for an opinion regarding the decedent's fitness to drive, assuming the decedent's consumption of alcohol prior to the accident and his blood alcohol as measured after the accident. The witness, over objection, responded that in his opinion the decedent was unfit to drive and incapable of driving safely. The witness then volunteered that the decedent, based on the amount of alcohol in his blood, must have had at least six or seven drinks, which would have diminished substantially his coordination, perception and alertness. Appellant did not object or request that the volunteered additional information be stricken.

This testimony, therefore, does not afford appellant a basis for the new trial which she seeks. The question asked

3. We similarly reject appellant's contention that appellee failed to establish the chain of custody of the specimen. The record shows that the specimen was extracted in the emergency room of the Montgomery Hospital and was properly labeled and stored in the emergency room refrigerator until it was picked up by the coroner. The coroner then took the specimen to his office where it was placed in a preservative and mailed to the State Laboratory. Nothing more by way of proof of chain of custody was required.

by counsel, to which appellant did object, was proper; it very clearly assumed only facts already in evidence. The contention that Dr. Rieder's volunteered explanation about the number of drinks consumed was based on conjecture was not objected to and was thereby waived. See: *Wilkerson v. Allied Van Lines, Inc.*, 360 Pa.Super. 523, 532, 521 A.2d 25, 30 (1987); *Kemp v. Qualls*, 326 Pa.Super. 319, 327, 473 A.2d 1369, 1373 (1984). If appellant had made a timely objection, the trial court could have made a ruling thereon at trial, and the volunteered nature of the answer could have been corrected by an appropriate question. Appellant will not be heard to object for the first time after trial, that the witness's testimony about the number of drinks consumed was either volunteered or speculative.

Appellant's contention that the decedent's manner of driving his vehicle a mile from the accident scene was too remote in time and distance to be relevant is also lacking in merit. In *Finnerty v. Darby*, 391 Pa. 300, 138 A.2d 117 (1958), the Supreme Court said:

> This Court has frequently ruled that testimony as to the speed or operation of an automobile at a point near and a short time before the collision is admissible and relevant to the issue of the speed of the vehicle at the time of the accident. Such evidence is admissible, its weight and credibility being for the jury. *Shellenberger v. Reading Transportation Co.*, 303 Pa. 122, 154 A. 297 [ (1931) ]; *Gerhart v. East Coast Coach Co.*, 310 Pa. 535, 166 A. 564 [ (1933) ]; *Rooney v. Maczko*, 315 Pa. 113, 172 A. 151 [ (1934) ]; *Commonwealth v. Pennzoil Company*, 358 Pa. 221, 56 A.2d 93 [ (1948) ]; *Pierontoni v. Barber*, 384 Pa. 56, 119 A.2d 503 [ (1956) ]. Whether the evidence of speed is too remote in time and distance depends upon the facts in each case, and to an extent whether it is the only evidence or is corroborative of other admissible evidence of speed.

*Id.*, 391 Pa. at 315–316, 138 A.2d at 124. See: *Fugagli v. Camasi*, 426 Pa. 1, 4–5, 229 A.2d 735, 736–737 (1967).

 In the instant case, the witnesses testified that decedent's Porsche had passed them, travelling at a high rate of speed,[4] at a point on Morris Road approximately one mile from the accident site. One of the witnesses stated also that after completing the pass decedent's vehicle had begun travelling at an even faster rate of speed. The witnesses testified that they had lost sight of the vehicle approximately one-quarter of a mile from the scene of the accident. The trial court ruled that the witnesses' observations were not so remote in time or distance as to render their observations irrelevant and permitted the testimony. There was neither error nor abuse of discretion in the court's ruling. The accident occurred on a narrow road at a time when traffic was not heavy. There were no intersections or other obstructions in the road that would have compelled the decedent to reduce his speed between the place where the witnesses observed him and the location of the accident. Other evidence disclosed that at the time of the accident decedent had been travelling at a rate of speed of between fifty-eight and sixty-three miles per hour. The speed at which the decedent's vehicle was travelling as it neared the point where it left the road, therefore, was clearly relevant. The weight to be placed on it, of course, was for the jury. See and compare: *Finnerty v. Darby, supra.*

Appellant also argues that the trial court erred in (1) permitting appellee's expert to testify beyond the scope of his pre-trial report; (2) permitting a witness, James Wonnell, to testify as an expert; and (3) allowing appellee's counsel, after ruling that comparative negligence principles had no application, to suggest to the jury that the decedent's negligence was the sole cause of the accident. We have examined these contentions carefully and conclude that they have been adequately analyzed and properly decided by the learned trial judge. Suffice it to say that

---

4. One of the witnesses estimated decedent's rate of speed to have been between 50 and 55 miles per hour, while the other estimated it to be between 80 and 90 miles per hour.

appellant's contentions are lacking in merit and do not warrant a new trial.

Judgment affirmed.