J-A22037-16

2016 PA Super 305

| KEVIN A. ROHE | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| DARRIS D. VINSON AND FENTON WELDING TRANSPORT, LLC | |
| Appellees | No. 2264 MDA 2015 |

Appeal from the Judgment Entered December 15, 2015
In the Court of Common Pleas of Bradford County
Civil Division at No(s): 12-CV-000287

BEFORE:  GANTMAN, P.J., PANELLA, J., and JENKINS, J.

OPINION BY GANTMAN, P.J.:                    **FILED DECEMBER 28, 2016**

Appellant, Kevin A. Rohe, appeals from the judgment entered in the Bradford County Court of Common Pleas, in favor of Appellees, Darris D. Vinson and Fenton Welding Transport, LLC, in this negligence action.  We reverse and remand for a new trial.

The relevant facts and procedural history of this case are as follows. On April 7, 2012, at approximately 7:15 p.m., Appellant was riding his motorcycle southbound on Route 220 in Albany Township, Bradford County. Route 220 is a two-lane highway, with one lane northbound and one lane southbound.  The weather conditions were clear and dry, and it was still light outside at that time.  Appellant was travelling in the southbound lane behind two trucks, a tractor-trailer and a tri-axle truck, with the tri-axle truck in the

lead. Appellee Mr. Vinson was operating the tri-axle truck; and his co-worker, Dennis Perry, was operating the tractor-trailer. Appellant reached a lawful passing zone that stretches approximately 750 feet, and he attempted to pass both trucks on the left. At the site of the passing maneuver, the speed limit on Route 220 had just changed from 25 mph to 45 mph. Both trucks were travelling below the 45 mph speed limit. In an effort to pass both vehicles within the passing zone, Appellant increased his speed to approximately 50 mph. After Appellant had successfully passed the tractor-trailer, he noticed the tri-axle truck had its left turn signal activated and was slowing down to turn into a gas station parking lot. Appellant pressed on his horn to notify the driver that Appellant was attempting to pass, but Mr. Vinson had already begun to turn left. Appellant struck the bumper of Mr. Vinson's vehicle and was ejected from the motorcycle. Mr. Vinson called 911. After aid from an Emergency Medical Services ("EMS") crew at the scene of the accident, Appellant was airlifted to a local hospital for medical treatment. As a result of the motor vehicle accident, Appellant sustained serious injuries requiring an above-the-knee amputation of his right leg.

On June 27, 2012, Appellant filed a complaint against Mr. Vinson and Fenton Welding Transport, LLC, alleging negligence and vicarious liability. Appellant alleged Mr. Vinson failed to activate his left turn signal early enough, turned directly into Appellant's path without ensuring the turn was safe to make, failed to yield the right of way to Appellant, and did not stay in

his own lane before Appellant completed his pass in the lawful passing zone. Appellant claimed Appellee Fenton Welding Transport, LLC (Mr. Vinson's employer) was vicariously liable for Mr. Vinson's negligence because Mr. Vinson was acting in the course and scope of his employment at the time of the accident. Appellees filed an answer and new matter on September 7, 2012; Appellant filed a reply on September 27, 2012.

Appellant filed a motion *in limine* on June 20, 2014, seeking to preclude at trial any reference to alcohol consumption by Appellant or his friend Carl Bird on the date of the accident. Appellant also sought to preclude any evidence showing that Appellant and Mr. Bird visited bars on the date of the accident. Appellant's motion contained the following eleven exhibits: (1) a map of the accident scene; (2) an excerpt of Mr. Bird's deposition testimony; (3) an excerpt of Appellant's deposition testimony; (4) the EMS report; (5) the police crash report; (6) an excerpt of the deposition testimony of Trooper Anthony Stempien, Jr.; (7) a report from Robert Packer Hospital, where Appellant was treated following the accident; (8) laboratory results from Geisinger Medical Center showing Appellant's blood alcohol level after the accident; (9) a letter from Dr. R.E. Hartman discussing the methodology used in relation to Appellant's blood alcohol level; (10) the expert report of toxicologist Dr. Gary Lage (Appellees' expert); and (11) an excerpt from Mr. Vinson's deposition testimony.

At his deposition, Mr. Bird testified, *inter alia*, he has known Appellant

over ten years and they typically ride motorcycles together once a week. On the date of the accident, Mr. Bird and Appellant met between 12:00 p.m. and 1:00 p.m. for a day-trip motorcycle ride. During the course of their trip, Appellant and Mr. Bird stopped at six bars. Appellant and Mr. Bird each consumed one beer at every bar they visited. At the final bar they visited, Mr. Bird and Appellant also ate dinner. Mr. Bird said Appellant might have consumed two beers at the last bar because they were eating. Appellant and Mr. Bird left the last bar at approximately 7:00 p.m. to return to their respective homes. Mr. Bird believed Appellant was capable of safe driving at all points throughout the day and had no concern about Appellant's ability to drive safely. (*See* Appellant's Motion *in Limine*, filed 6/20/14, at Exhibit 2 (Deposition of Carl Bird, 6/26/13); R.R. at 23a-47a).

Appellant testified at his deposition, *inter alia*, he visited six bars with Mr. Bird over a six-to-seven-hour period on the day of the accident. At each bar, Appellant consumed one 12-ounce Michelob Ultra light beer, except at the last bar where Appellant consumed two 12-ounce Michelob Ultra light beers. Appellant confirmed he and Mr. Bird ate dinner at the last bar they visited. Appellant also indicated he ate breakfast the morning of the accident and had a snack around 10:00 a.m. before the motorcycle ride. On Appellant's way home from the last bar, he was driving behind two trucks—a tractor-trailer and a tri-axle truck in the lead. Appellant had driven on Route 220 many times and knew the upcoming passing zone was the last

opportunity he would have to pass the trucks before reaching his destination. Appellant was approximately 50-75 feet behind the tractor-trailer when he decided to pass both trucks. Appellant did not see any oncoming traffic in the northbound lane, so he activated his left turn signal and began the passing maneuver. Appellant admitted he was driving about 50 mph in a 45 mph zone to pass the trucks. After Appellant completed his pass of the tractor-trailer, he stayed straight to pass the tri-axle truck. Appellant then noticed the tri-axle truck had its left turn signal activated. At that point, Appellant could not safely maneuver between the trucks due to the limited amount of space. Appellant also did not think he could safely veer left into the gas station parking lot because that parking lot has numerous large potholes. Appellant honked his horn to alert the driver of the tri-axle truck that Appellant was trying to pass, but the vehicles collided before Appellant had an opportunity to brake or slow down. (*Id.* at Exhibit 3 (Deposition of Appellant, 1/30/13); R.R. at 46a-67a).

The EMS report indicated Appellant was alert upon the EMS crew's arrival. The report stated Appellant admitted to alcohol use. Aside from Appellant's admission, the report made no mention of Appellant's alcohol use or suggested Appellant was under the influence of alcohol. (*Id.* at Exhibit 4 (EMS report, 4/8/12); R.R. at 68a-72a). The police crash report stated police were dispatched to the accident scene at 7:26 p.m. and arrived at 7:32 p.m. The report indicated police spoke with Appellant at the accident

scene and did not suspect Appellant was under the influence of drugs or alcohol. (*Id.* at Exhibit 5 (Police Crash Report, 4/7/12); R.R. at 73a-78a).

Trooper Stempien testified at his deposition, *inter alia*, he spoke to Appellant at the accident scene; and Appellant explained how he had attempted to pass both trucks. Trooper Stempien also interviewed Mr. Vinson. Trooper Stempien confirmed he had no reason to believe, by smell or otherwise, that Appellant was under the influence of drugs or alcohol. (*Id.* at Exhibit 6 (Deposition of Trooper Stempien, 1/29/14); R.R. at 79a-82a).

The report from Robert Packer Hospital indicated Appellant's toxicology screen was negative except for alcohol. (*Id.* at Exhibit 7 (Robert Packer Hospital report, 4/11/12); R.R. at 83a-84a). Appellant's laboratory results stated the hospital drew Appellant's blood at 9:10 p.m. (within two hours of the accident), and Appellant's blood alcohol level was 0.08%. (*Id.* at Exhibit 8 (Laboratory results, 4/7/12); R.R. at 85a). Dr. Hartman's letter stated the current methodology used to calculate Appellant's blood alcohol level (as reflected in the hospital and laboratory reports) uses only serum or plasma and does not convert the specimen into a whole blood sample. (*Id.* at Exhibit 9 (Dr. Hartman letter, 7/23/13); R.R. at 86a).

Dr. Lage's expert report conceded Appellant's blood alcohol level must be converted to a whole blood sample to calculate Appellant's blood alcohol content ("BAC") because serum levels are higher than whole blood by about

16%. Using the proper whole blood conversion, Appellant's BAC at the time of the blood draw equaled 0.0706%. Dr. Lage's report indicated Appellant is 5'11" and approximately 200 pounds. Dr. Lage's report discussed how food delays the absorption of alcohol and how beer acts as a food and delays the absorption of alcohol. Dr. Lage's report described the typical effects of alcohol on a person where the person's BAC is between 0.05% and 0.10%. Dr. Lage said Appellant's BAC at the time of the blood draw was inconsistent with the amount of alcohol Appellant admitted consuming. Dr. Lage estimated Appellant could have drunk approximately eleven beers on the day of the accident. Dr. Lage's report also stated the EMS personnel, airlift crew, and hospital employees all detected an odor of alcohol on Appellant.[1] Using "relation back" calculations, Dr. Lage opined Appellant's BAC was on the decline at the time of the blood draw and was between 0.085% and 0.10% at the time of the accident, depending on when Appellant consumed his final beer. Based on Dr. Lage's calculation, he concluded Appellant was impaired, incapable of safe driving at the time of the accident, and his intoxication was a significant causative factor in the accident. (*Id.* at Exhibit 10 (Dr. Lage's Expert Report, 5/8/14); R.R. at 87a-91a).

Mr. Vinson testified, *inter alia*, he checked his rearview mirror approximately twenty feet before turning left. Mr. Vinson did not see

---

[1] Nothing in the record supports Dr. Lage's statement that Appellant had an odor of alcohol on him at the time of the accident or thereafter.

Appellant in his rearview mirror at that time. Mr. Vinson heard Appellant's horn as he began to make the left turn but, at that point, it was too late to avoid a collision. Mr. Vinson said he slammed on his brakes but could not escape the crash. Mr. Vinson testified he did not see Appellant until a fraction of a second before impact. (*Id.* at Exhibit 11 (Deposition of Darris Vinson, 1/30/13); R.R. at 92a-97a).

Appellant submitted a brief in support of his motion *in limine* on June 23, 2014. Appellees filed their brief opposing Appellant's motion on August 11, 2014, along with the following seven exhibits: (1) Dr. Lage's expert report; (2) the full deposition testimony of Ronald Laxton, an eyewitness to the accident; (3) Appellant's full deposition testimony; (4) Carl Bird's full deposition testimony; (5) Trooper Stempien's full deposition testimony; (6) Mr. Vinson's full deposition testimony; and (7) the EMS report.[2]

At his deposition, eyewitness Mr. Laxton testified, *inter alia*, he saw two large water trucks travelling on Route 220 on the day of the accident. Mr. Laxton observed a motorcyclist attempting to pass both trucks and thought to himself, "[L]ook at that fool, he's gonna get hurt." (**See** Brief Opposing Motion *in Limine*, filed 8/11/14, at Exhibit B (Deposition of Ronald Laxton, 9/5/13, at 25); R.R. at 197a). Mr. Laxton acknowledged the passing zone and said: "I don't know if it was legal or not but I think it was kind of

---

[2] Mr. Perry, the driver of the tractor-trailer, died before Appellant filed suit, so no party was able to obtain his deposition testimony.

stupid for what [Appellant] was trying to pass." (*Id.* 28; R.R. at 200a). Notwithstanding the lawful passing zone, Mr. Laxton stated: "I wouldn't pass there. It's not a safe place to pass." (*Id.* at 29; R.R. at 201a). Mr. Laxton explained there were a couple of accidents in that location in the past. Mr. Laxton observed Appellant begin to pass the trucks before he entered the lawful passing zone. Mr. Laxton said the tri-axle truck already had its turn signal activated when Appellant initiated the pass. Mr. Laxton thought: "[L]ook at this sucker, he's dead." (*Id.* at 37; R.R. at 209a). Mr. Laxton agreed Appellant could not have safely turned into the gas station parking lot due to the potholes. After the collision, Mr. Laxton spoke to Appellant. Appellant told Mr. Laxton "he [Appellant] fucked up." (*Id.* at 46; R.R. at 218a).

In the full deposition transcript, Appellant's friend Mr. Bird further explained he had no concern about Appellant's ability to drive safely on the date of the accident because Appellant was acting "normal" and was not slurring his words or exhibiting any other outward signs of intoxication. (*Id.* at Exhibit D (Deposition of Carl Bird, 6/26/13, at 27); R.R. at 306a).

In the full deposition transcript, Mr. Vinson said he spoke to Appellant after the accident and asked if Appellant saw Mr. Vinson's turn signal activated, and Appellant responded affirmatively. Appellant told Mr. Vinson: "[D]on't worry about it, it's my fault[.]" (*Id.* at Exhibit F (Deposition of Darris Vinson, 1/30/13, at 36); R.R. at 377a). During his discussion with

Appellant at the accident scene, Mr. Vinson made no observations suggesting Appellant was under the influence of alcohol.

Appellant filed a reply brief in support of his motion *in limine* on September 18, 2014. The court held oral argument on the motion the next day. On September 24, 2014, Appellant submitted a report from Henry Cifuni, an expert in motorcycle safety, indicating there was nothing Appellant could have done differently to avoid the accident. Appellees submitted a *sur* reply brief opposing the motion *in limine* on September 29, 2014. The trial court denied Appellant's motion *in limine* on December 9, 2014.

Appellant proceeded to a jury trial on September 22, 2015.[3] Based on the earlier court's pre-trial ruling, the jury heard all evidence related to Appellant's alcohol consumption. The next day, the jury returned a defense verdict expressly finding Mr. Vinson was not negligent. Consequently, the jury did not address whether Appellant was contributorily negligent. Appellant timely filed a motion for post-trial relief on September 28, 2015, challenging the court's ruling on his motion *in limine* and the admission at trial of evidence related to his alcohol consumption. Following oral argument, the court denied Appellant's post-trial motion on December 1, 2015. On December 15, 2015, Appellant filed a *praecipe* for entry of final judgment, which was entered that day. Appellant timely filed a notice of

_____

[3] A different jurist presided over trial.

appeal on December 21, 2015. On January 6, 2016, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which Appellant timely filed on January 15, 2016.

Appellant raises two issues for our review:

> WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ITS ORDER OF DECEMBER 9, 2014, DENYING [APPELLANT'S] MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF HIS ALCOHOL CONSUMPTION PRIOR TO HIS MOTOR VEHICLE CRASH, WHERE THE EVIDENCE DID NOT REASONABLY ESTABLISH A DEGREE OF INTOXICATION WHICH PROVED HE WAS UNFIT TO DRIVE, AND WHERE THE EVIDENCE OF ALCOHOL CONSUMPTION WAS UNDULY PREJUDICIAL.
>
> WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ITS ORDER OF DECEMBER 1, 2015 DENYING [APPELLANT'S] MOTION FOR A NEW TRIAL BASED UPON THE INTRODUCTION OF EVIDENCE OF ALCOHOL CONSUMPTION, WHERE THE EVIDENCE ADMITTED AT TRIAL DID NOT REASONABLY ESTABLISH A DEGREE OF INTOXICATION WHICH PROVED HE WAS UNFIT TO DRIVE, AND WHERE THE EVIDENCE WAS UNDULY PREJUDICIAL.

(Appellant's Brief at 4).

Appellate review of the denial of a post-trial motion for a new trial is guided by the following principles:

> The Superior Court's standard for reviewing the trial court's denial of a motion for a new trial is whether the trial court clearly and palpably abused its discretion or committed an error of law which affected the outcome of the case. We will reverse the trial court's denial of a new trial only where there is a clear abuse of discretion or an error of law which controlled the outcome of the case. The trial court abuses its discretion when it misapplies the law or when it reaches a manifestly unreasonable, biased or

- 11 -

prejudiced result. Abuse of discretion may occur through an honest, but erroneous use of discretion. A new trial may not be granted merely because the evidence conflicts and the jury could have decided for either party. The grant of a new trial is appropriate, however, where the jury verdict **may have been** based on improperly admitted evidence.

\* \* \*

Questions regarding the admissibility or exclusion of evidence are also subject to the abuse of discretion standard of review. Pennsylvania trial judges enjoy broad discretion regarding the admissibility of potentially misleading and confusing evidence. Relevance is a threshold consideration in determining the admissibility of evidence. A trial court may, however, properly exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Generally[,] for the purposes of this evidentiary rule, "prejudice" means an undue tendency to suggest a decision on an improper basis. The erroneous admission of harmful or prejudicial evidence constitutes reversible error.

**Whyte v. Robinson**, 617 A.2d 380, 382-83 (Pa.Super. 1992) (emphasis in original) (internal citations omitted).

For purposes of disposition, we combine Appellant's issues. Appellant asserts that the mere fact of drinking alcohol is inadmissible in a civil negligence case, unless the evidence establishes a degree of intoxication which proves unfitness to drive. Appellant admits he consumed six beers over a six-to-seven-hour period before the accident.[4] Appellant argues no evidence showed he was unfit to drive. Appellant emphasizes the EMS

---

[4] At his deposition, Appellant conceded he drank seven beers over that timeframe.

report, Robert Packer Hospital records, police crash report, deposition testimony of Trooper Stempien, and accounts from all persons in contact with Appellant after the accident made no mention of any indicators that Appellant was intoxicated. Appellant claims the most significant evidence is that he did not exhibit any of the classic signs of intoxication before, during, or after the accident, such as glassy or bloodshot eyes, incoherent mumbling, slurred speech, an odor of alcohol, or erratic behavior. Appellant further highlights Mr. Bird's deposition testimony that he did not believe Appellant was intoxicated. Appellant contends his admission to consuming beers and his blood alcohol test results establish only that he had been drinking on the day of the accident, but not that he was unfit to drive. Appellant submits there was similarly no evidence that Mr. Bird was intoxicated on the day of the accident.

Appellant rejects the "relation back" testimony and opinion of Appellees' expert, Dr. Lage, as wholly inconsistent with the other evidence of record and as highly speculative, where Dr. Lage failed to account for several variables which could have affected Appellant's BAC. For example, Dr. Lage failed to account for Appellant's consumption of food at the last establishment he visited before the accident, the fact that beer is absorbed more slowly than other alcoholic beverages, and that the severe trauma of the accident could have affected his absorption rate. Appellant contends Dr. Lage offered nothing to support his assertion that Appellant's blood alcohol

level was declining at the time of the blood draw, which is particularly troubling where Dr. Lage had no information regarding what time Appellant had consumed his last beer. Appellant submits the court erred when it denied his motion *in limine* and allowed at trial evidence of his alcohol consumption, as the admission of that evidence was unfairly prejudicial. Appellant stresses the error was not harmless, because evidence of alcohol consumption in a civil negligence case like his has a pernicious influence, which might have led to the defense verdict. Appellant concludes this Court must grant him a new trial. For the following reasons, we agree.

Pennsylvania law makes clear: "[W]hile proof of intoxication is relevant where reckless or careless driving of an automobile is the matter at issue, the mere fact of drinking intoxicating liquor is not admissible, being unfairly prejudicial, unless it reasonably establishes a degree of intoxication which proves unfitness to drive." *Fisher v. Dye*, 386 Pa. 141, 148, 125 A.2d 472, 476 (1956). The "objective criteria normally required to establish intoxication include evidence of staggering, stumbling, aimless wandering, glassy eyes or incoherent mumbling." *Locke v. Claypool*, 627 A.2d 801, 804 (Pa.Super. 1993) (internal quotation marks omitted).

An individual's blood alcohol level can also be relevant circumstantial evidence of intoxication. *Ackerman v. Delcomico*, 486 A.2d 410 (Pa.Super. 1984). "However, blood alcohol level alone may not be admitted for the purpose of proving intoxication. **There must be other evidence**

**showing the actor's conduct which suggests intoxication.**" *Id.* at 414

(emphasis added). The "other" evidence necessary to render admissible a

BAC **in excess of the legal limit** "may also consist of expert testimony

interpreting the significance of the results of blood alcohol tests with respect

to unfitness to drive." *Gallagher v. Ing*, 532 A.2d 1179, 1183 (Pa.Super.

1987), *appeal denied*, 519 Pa. 665, 548 A.2d 255 (1988).

> The rationale behind this rule is that when a person's blood alcohol content exceeds [the legal limit], our legislature has determined that he is presumptively unfit to drive. The "presumption" of unfitness to drive, however, is inapplicable to civil cases, and a jury may not be instructed regarding the presumption. Therefore, expert testimony is helpful to explain the significance of a blood alcohol content above [the legal limit], without reference to the "presumption."

*Locke, supra* at 805 (internal citations omitted).[5] "[I]n cases that have

admitted blood alcohol tests, not only did independent evidence corroborate

an inference that the person was intoxicated, but his…blood alcohol level

was above…the statutorily presumptive level of unfitness to operate a

---

[5] At the time of this Court's decision in *Locke*, *Gallagher*, and other earlier cases, the legal limit for driving under the influence ("DUI") of alcohol was 0.10%. On September 30, 2013, the legislature lowered the legal limit to 0.08%. *See* 75 Pa.C.S.A. § 3731(a)(4)(i) (effective September 30, 2003 to January 31, 2004). The current legal limit (in effect at the time of Appellant's accident) remains 0.08%. *See* 75 Pa.C.S.A. § 3802(a)(2) (explaining under general impairment provision of statute, individual may not drive, operate or be in actual physical control of movement of vehicle after imbibing sufficient amount of alcohol such that alcohol concentration in individual's blood or breath is at least 0.08% but less than 0.10% within two hours after individual has driven, operated or been in actual physical control of movement of vehicle).

vehicle." *Locke, supra* at 804-05.

In civil negligence cases, "there is no precise type or amount of evidence necessary to establish the requisite degree of intoxication[.]" *Braun v. Target Corp.*, 983 A.2d 752, 760 (Pa.Super. 2009), *appeal denied*, 604 Pa. 701, 987 A.2d 158 (2009). Nevertheless:

> [T]his Court has found the following intoxication evidence admissible as unfitness to perform the task at hand: *Kraus v. Taylor*, 710 A.2d 1142 (Pa.Super. 1998), *appeal dismissed as improvidently granted*, 560 Pa. 220, 743 A.2d 451 (2000) (holding trial court properly admitted evidence of pedestrian's alcohol consumption where (1) responding officer detected scent of alcohol on pedestrian's breath following accident; (2) hospital measured pedestrian's BAC level in excess of 0.25 percent within forty (40) minutes of accident; and (3) expert testimony established that, given BAC results, pedestrian's judgment and motor skills would have been severely impaired at time of accident); *Crosby v. Com., Dept. of Transp.*, [548 A.2d 281 (Pa.Super. 1988), *appeal denied*, 522 Pa. 576, 559 A.2d 37 (1989)] (holding evidence revealed more than mere hint of intoxication where (1) officer testified he smelled odor of alcohol on plaintiff; (2) plaintiff's BAC was 0.101 percent; (3) expert toxicologist opined plaintiff's BAC rendered him unfit to drive; and (4) plaintiff was familiar with road, but drove off of it, straight into tree); *Ackerman, supra* (holding trial court properly admitted evidence of intoxication, and such evidence was not prejudicial where (1) plaintiff's girlfriend and roommate stated plaintiff had been drinking beer since late afternoon on day of accident; (2) defendant and medical personnel testified plaintiff strongly smelled of beer; (3) plaintiff's BAC was 0.195 percent; (4) hospital records revealed plaintiff admitted drinking heavily; and (5) plaintiff had slurred speech and low level of alertness following accident).

*Braun, supra* at 761 (holding evidence demonstrated more than mere hint of intoxication where (1) Mr. Braun consumed alcohol throughout day before

accident; (2) witnesses observed Mr. Braun drink beer at lunch shortly before accident; (3) Mr. Braun ascended eighteen feet above ground on scissor lift and failed to tie off, even though safety equipment on railed platform was readily accessible to him; (4) Mr. Braun inexplicably and unnecessarily stepped off railed platform onto eight inch wide steel beam; (5) Mr. Braun's BAC was 0.27%; and (6) expert opined Mr. Braun's high BAC would render him physically and behaviorally impaired and drastically increase his risk of falling). *See also Gallagher, supra* (holding evidence of alcohol consumption was admissible where evidence showed (1) decedent had been drinking scotch for approximately 1½ hours before getting in car to drive home; (2) several witnesses observed decedent driving at high rate of speed on dark, winding, and hilly road approximately one mile from accident scene; (3) decedent's BAC was 0.18%; (4) expert testified extensively regarding significance of such high alcoholic content with respect to decedent's ability to drive safely). *Compare Vignoli v. Standard Motor Freight, Inc.*, 418 Pa. 214, 210 A.2d 271 (1965) (holding evidence of alcohol consumption was inadmissible where only evidence of driver's intoxication was his admission to consuming two beers prior to driving and several hours had elapsed between alcohol consumption and accident; and (2) two people stated driver was acting "funny" at accident scene; such evidence falls far short of reasonably establishing requisite degree of intoxication); *Locke, supra* (holding evidence of alcohol consumption was

inadmissible where only evidence of plaintiff's intoxication was (1) officer's testimony that he smelled odor of beer emanating from ambulance which housed plaintiff at scene of accident; (2) blood test indicating plaintiff's BAC was 0.06%, which was below statutory limit; and (3) testimony from expert, who extrapolated test results and concluded plaintiff would have exaggerated reaction to alcohol because he was underage; significantly, plaintiff exhibited no physical signs to indicate he was unfit to operate his bicycle, such as riding his bike erratically, slurring his speech, or otherwise appearing intoxicated; sole independent evidence which might indicate plaintiff was intoxicated was police officer's testimony that he smelled beer emanating from plaintiff; without more, however, this evidence proves only that plaintiff consumed alcohol; it is insufficient to prove intoxication).

This Court has viewed with skepticism expert testimony in civil cases that extrapolates (or "relates back") blood test results. *Id.* at 805 (explaining expert's "relation back" testimony that plaintiff's BAC was between 0.075% and 0.08% at time of accident is entirely speculative and highly prejudicial where plaintiff's BAC at time of blood draw was below statutory legal limit and absent any objective indicia plaintiff was unfit to operate bicycle). *See also generally Whyte, supra* (discussing speculative nature of "relation back" testimony).

Instantly, the evidence presented to the court in Appellant's motion *in limine*, and in Appellees' opposition showed: Appellant and Mr. Bird met

- 18 -

between 12:00 p.m. and 1:00 p.m. on the date of the accident for a motorcycle day-trip. During their ride, Appellant and Mr. Bird stopped at six bars. Appellant and Mr. Bird consumed one beer each at the first five bars. At the last establishment, Appellant consumed two 12-ounce Michelob Ultra light beers. Appellant and Mr. Bird ate dinner at the last establishment. Appellant and Mr. Bird departed the last bar at approximately 7:00 p.m. to go home. Mr. Bird had no concern about Appellant's ability to drive safely because Appellant was acting "normal" and was not slurring his words or exhibiting any other outward signs of intoxication.

While driving home on Route 220, Appellant noticed two trucks in front of him—a tractor-trailer and a tri-axle truck in the lead. Appellant was familiar with Route 220, as he had previously travelled that road numerous times. Appellant knew the upcoming legal passing zone would be his only opportunity to pass the trucks before arriving at his destination, so Appellant activated his left turn signal and began to pass both trucks. After Appellant successfully completed his pass of the tractor-trailer, Appellant noticed the tri-axle truck had its left turn signal activated. Appellant pressed his horn to alert Mr. Vinson but neither of them was able to avoid the collision. Henry Cifuni, an expert in motorcycle safety, opined there was nothing Appellant could have done differently to avoid the accident.

Ronald Laxton witnessed the accident. Mr. Laxton acknowledged the lawful passing zone, but he said the passing zone is not well situated and

pointed out that other accidents occurred in that location. Mr. Laxton thought Appellant was a "fool" and "stupid" for trying to pass the trucks. Mr. Laxton conceded Appellant could not have safely veered left into the gas station parking lot because of the potholes and rough terrain. After the collision, Mr. Laxton spoke to Appellant; Appellant told Mr. Laxton "he [Appellant] fucked up." Mr. Laxton did not mention any behavior by Appellant that would suggest Appellant was under the influence of alcohol.

Mr. Vinson spoke to Appellant at the accident scene and called 911. During their conversation, Appellant said: "[D]on't worry about it, it's my fault." Mr. Vinson did not notice any signs indicating Appellant was under the influence of alcohol. EMS personnel arrived at the scene shortly thereafter. Appellant was alert during treatment and admitted to alcohol use. No member of the EMS crew noted that Appellant displayed any signs indicating he was under the influence of alcohol or otherwise impaired. Trooper Stempien spoke with Appellant at the accident scene. During their conversation, Appellant explained what took place. Trooper Stempien made clear during his deposition he had no reason to believe Appellant was under the influence of alcohol.

Appellant was airlifted to Robert Packer Hospital. The hospital performed a toxicology screen which tested negative except for alcohol. A blood draw taken within two hours of the accident showed a blood alcohol level of 0.08%. Dr. Hartman confirmed that the current methodology for

analyzing Appellant's blood draw (as reflected in the hospital and laboratory reports) uses only serum or plasma.

Appellees' expert, Dr. Lage, conceded in his expert report that Appellant's blood alcohol level must be converted to a whole blood sample to calculate the proper BAC because serum levels are higher than whole blood by about 16%. Using the proper conversion, Appellant's BAC at the time of the blood draw equaled 0.0706%. Dr. Lage said the level of alcohol in Appellant's blood at the time of the blood draw is inconsistent with the amount of alcohol Appellant admitted consuming. Dr. Lage estimated Appellant must have drunk approximately eleven beers prior to the accident. Dr. Lage's report also erroneously stated the EMS personnel, airlift crew, and hospital employees all detected an odor of alcohol on Appellant, which is inconsistent with the record. Using "relation back" calculations, Dr. Lage opined Appellant's BAC was on the decline at the time of the blood draw and was between 0.085% and 0.10% at the time of the accident, depending on when Appellant consumed his final beer, which Dr. Lage did not know. Based on this calculation, Dr. Lage opined Appellant was incapable of safe driving at the time of the accident, and Appellant's intoxication was a significant causative factor in the accident.

Under these facts, we cannot agree with the trial court's decision that the evidence presented reasonably establishes a degree of intoxication which demonstrated Appellant was unfit to drive. **See Fisher, supra**. The

deposition testimony from Appellant and Mr. Bird unequivocally establish the men drank beer over a six-to-seven-hour period on the day of the accident; such testimony, however, proves only that Appellant consumed alcohol and is insufficient to prove intoxication. **See Locke, supra**. Following the accident, Appellant spoke with numerous individuals including Mr. Vinson, Mr. Laxton, EMS personnel, Trooper Stempien, an airlift crew, and hospital employees. None of these people indicated that Appellant displayed **any** of the classic signs of intoxication such as glassy eyes, an odor of alcohol, or incoherent mumbling. **See id.**

Additionally, Mr. Laxton's opinion that Appellant was a "fool" and "stupid" for trying to pass both trucks simply suggests Appellant's poor judgment. Appellant's comment to Mr. Laxton that Appellant "fucked up" and his statement to Mr. Vinson accepting fault similarly do not tend to prove intoxication, only Appellant's poor judgment in his passing maneuver. **See id.** at 804 n.2 (rejecting trial court's consideration of plaintiff's "lack of prudent judgment" in riding bicycle in dark on major highway at 2:10 a.m. without reflectors as evidence of intoxication; whether plaintiff acted with prudent judgment is matter of contributory negligence which jury must decide; evidence of plaintiff's poor judgment does not necessarily show he acted under effects of alcohol).

Appellant's whole-blood-conversion BAC, taken at the hospital within two hours of the accident, was 0.0706%, according to Dr. Lage, which is

below the legal limit in Pennsylvania. **See** 75 Pa.C.S.A. § 3802(a)(2). To admit Appellant's BAC results in this case, therefore, required additional conduct of Appellant suggesting intoxication.[6] **See Ackerman, supra**. Dr. Lage's expert testimony interpreting and explaining the effects of alcohol on a person with this low BAC cannot, on its own, constitute the requisite "other" evidence, where Appellant's BAC at the time of the blood draw was **below** the statutory legal limit. **Compare Coughlin v. Massaquoi**, 138 A.3d 638 (Pa.Super. 2016), *appeal granted*, ___ Pa. ___, 144 A.3d 925 (2016) (holding expert's testimony that pedestrian/decedent's BAC of 0.313% rendered him unfit to cross safely four-lane avenue intersection at night was sufficient corroborating evidence for admission of his BAC result)[7]; **Braun, supra** (holding evidence demonstrated more than mere hint of intoxication where, *inter alia*, Mr. Braun's BAC was 0.27%, and expert opined Mr. Braun's high BAC would render him physically and behaviorally impaired and drastically increase his risk of falling); **Gallagher, supra** (holding evidence of alcohol consumption was admissible where evidence showed, *inter alia*, decedent's BAC was 0.18%, and expert testified

---

[6] At trial, Appellant produced expert testimony from forensic toxicologist Dr. Michael Coyer, who testified Appellant's BAC at the time of the blood draw was 0.069% using the proper conversion rate. The experts agreed at trial that the difference in their calculations was statistically insignificant.

[7] On August 24, 2016, our Supreme Court granted allowance of appeal in **Coughlin** to decide whether the trial court erred by admitting the pedestrian/decedent's BAC results and the expert's testimony.

extensively regarding significance of such high alcoholic content with respect to decedent's ability to drive safely).

Further, we cannot accept that Dr. Lage's opinion itself was the sufficient "other" evidence of Appellant's intoxication. Importantly, Dr. Lage's expert report misstates facts of record. Dr. Lage's report falsely states the EMS team, airlift crew, and hospital employees all detected an odor of alcohol on Appellant. (***See*** Appellant's Motion *in Limine* at Exhibit 10 (Dr. Lage's Expert Report at 4); R.R. at 90a). The record, however, belies that premise. Moreover, we cannot know if Dr. Lage relied on his own misstatement when he conducted his "relation back" analysis.[8] In this scenario, Dr. Lage's "relation back" testimony is simply too speculative and highly prejudicial, where Appellant's BAC at the time of the blood draw was below the statutory limit, there was no other objective indicia Appellant was unfit to drive, or any record evidence of when Appellant consumed his last beer.[9] ***See Locke, supra***; ***Whyte, supra***. For these reasons, the trial

---

[8] Appellant's expert Dr. Coyer hotly disputed Dr. Lage's conclusions at trial. Dr. Coyer opined Appellant's BAC level was rising following the accident and calculated Appellant's BAC at the time of the accident as less than 0.05%, possibly 0.03% or 0.04%. Appellant did not retain Dr. Coyer until closer to trial so his findings do not appear in the filings relevant to the motion *in limine*.

[9] Appellant properly preserved his challenge to Dr. Lage's "relation back" testimony and report in Appellant's motion *in limine* and supporting brief, so he did not need to renew his objection at trial. ***See*** Pa.R.E. 103(b) (stating: "Once the court rules definitively on the record—either before or at trial—a
*(Footnote Continued Next Page)*

court should have excluded from trial any reference to alcohol consumption by Appellant or Mr. Bird or that they visited bars on the date of the accident. *See Vignoli, supra*; *Locke, supra*; *Whyte, supra*. *See also Morreale v. Prince*, 436 Pa. 51, 53, 258 A.2d 508, 508-09 (1969) (stating: "In terms of the possible prejudice there is no functional difference between evidence that a litigant was drinking and evidence that he was in a bar. Both pieces of evidence give rise to the insidious inference that the individual involved was intoxicated or under the influence of alcohol, which inference, without some proof of intoxication, has no role to play in any case").

As the jury verdict here could have been affected by the improperly admitted evidence, we cannot agree the error was harmless. The potentially pernicious effect of admitting evidence of alcohol consumption in this case warrants a new trial. *See Whyte, supra* (stating trial court's erroneous admission of harmful and prejudicial evidence of alcohol consumption, with its potentially pernicious effects, warranted new trial). *See also Locke, supra* (explaining that, without independent evidence to corroborate defendant's contention that plaintiff was intoxicated while operating his bicycle, possibility was too great that jury placed undue emphasis on mere

*(Footnote Continued)* ───────────

party need not renew an objection or offer of proof to preserve a claim of error for appeal"); *Blumer v. Ford Motor Co.*, 20 A.3d 1222 (Pa.Super. 2011), *appeal denied*, 616 Pa. 649, 49 A.3d 441 (2012) (explaining that under Rule 103, ruling on merits of motion *in limine* on record is sufficient to preserve issue for appeal, without renewal of objection at trial).

fact that plaintiff had consumed alcohol on evening of accident).

Based upon the foregoing, we hold the evidence presented in this civil negligence case failed to establish a degree of intoxication reasonably demonstrating Appellant's unfitness to drive, notwithstanding Appellant's admission to drinking alcohol of the date of the accident. Therefore, the trial court erred when it denied Appellant's motion *in limine* and allowed at trial any evidence of Appellant's or Mr. Bird's alcohol consumption or visits to bars on the day of the accident, including Appellant's BAC results and expert testimony discussing those results. The erroneous admission of this evidence was not harmless error under the facts of this case, and Appellant should have a new trial. Accordingly, we reverse and remand.

Judgment reversed; case remanded for further proceedings. Jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/28/2016